# Exhibit A

Volume 1

Pages 1 - 88

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jacqueline Scott Corley, Magistrate Judge

BRIAN WHITAKER,                  )
                                 )
          Plaintiff,             )
                                 )
  VS.                            )   NO. C 21-03750 JSC
                                 )
SLAINTE BARS, LLC, a             )
California Limited Liability     )
Company; and DOES 1-10,          )
                                 )
          Defendants.            )
_____ )

San Francisco, California
Monday, February 7, 2022

**TRANSCRIPT OF REMOTE ZOOM VIDEO CONFERENCE PROCEEDINGS**

**EVIDENTIARY HEARING**

**APPEARANCES VIA ZOOM:**

For Plaintiff:

                    CENTER FOR DISABILITY ACCESS
                    8033 Linda Vista Road, Suite 200
                    San Diego, California 92111
              BY:   **DENNIS J. PRICE, II, ATTORNEY AT LAW**

For Defendant:

                    SAHELIAN LAW OFFICES
                    25108 Marguerite Parkway, Suite A
                    Mission Viejo, California 92692
              BY:   **ARA SAHELIAN, ATTORNEY AT LAW**

REPORTED REMOTELY BY:  Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
                       CSR No. 7445, Official U.S. Reporter

# I N D E X

Monday, February 7, 2022 - Volume 1

| PLAINTIFF'S WITNESSES | PAGE | VOL. |
|---|---|---|
| **WHITAKER, BRIAN** | | |
| (SWORN) | 8 | 1 |
| Direct Examination by Mr. Price | 9 | 1 |
| Cross-Examination by Mr. Sahelian | 28 | 1 |
| Redirect Examination by Mr. Price | 74 | 1 |

PROCEEDINGS

| | |
|---|---|
| 1 | <u>**Monday - February 7, 2022**</u>                                    <u>**9:31 a.m.**</u> |
| 2 | <u>**P R O C E E D I N G S**</u> |
| 3 | ---o0o--- |
| 4 | **THE CLERK:**  Court is now in session.  The Honorable |
| 5 | Jacqueline Scott Corley presiding. |
| 6 | Calling Civil Action C 21-3750, Whitaker versus |
| 7 | Slainte Bars, LLC. |
| 8 | Counsel, starting with plaintiff, will you please state |
| 9 | your appearance for the record. |
| 10 | **MR. PRICE:**  Good morning, Your Honor.  Dennis Price for |
| 11 | the plaintiff, Brian Whitaker. |
| 12 | **THE COURT:**  Good morning, Mr. Price. |
| 13 | **MR. SAHELIAN:**  Good morning, Your Honor.  Ara Sahelian for |
| 14 | the defendant. |
| 15 | **THE COURT:**  Good morning. |
| 16 | Okay.  So we're here on defendant's motion to dismiss the |
| 17 | ADA claim for lack of standing.  I found that, as a facial |
| 18 | challenge, the plaintiff had sufficiently alleged standing, but |
| 19 | defendant then was making a factual challenge, which raised |
| 20 | disputed issues of fact.  So we're having this evidentiary |
| 21 | hearing this morning. |
| 22 | As the burden is on Mr. Whitaker to prove his standing, |
| 23 | Mr. Price, I'll have the plaintiff go first.  So I understand |
| 24 | there's only one witness, Mr. Whitaker, that each party wishes |
| 25 | to call.  So, Mr. Price, are you prepared to go forward with |

1    Mr. Whitaker's testimony?

2        **MR. PRICE:**  I am, Your Honor, but I would like to register

3    an objection on the record before we get started, if I may.

4        **THE COURT:**  Okay.

5        **MR. PRICE:**  I just want to register an objection to the

6    process here.

7        I think that the Ninth Circuit has claimed that when

8    factual standing -- factual attacks on standing are inseparable

9    from the merits analysis.  They're improper, both under

10   Rule 12; and more importantly, even if we extend this as a Rule

11   56 meeting, because when the factual issues under jurisdiction

12   are coextensive with the merits analysis, they're inseparable.

13       And the way that General Order 56 works, Rule 56 motions

14   are barred.  And if it's only going to be the case that they're

15   barred as to the plaintiff, then it's a due process end run.

16       **THE COURT:**  It's not a Rule -- Rule 56 would be summary

17   judgment.

18       **MR. PRICE:**  I --

19       **THE COURT:**  If we were doing summary judgment, you would

20   likely win -- right? -- because we draw inferences in your

21   favor.  So I'm not quite sure I understand the objection.

22       **MR. PRICE:**  My objection is, in the *Acevedo v. CNS* case,

23   which was a Ninth Circuit case involving the ADA -- that's

24   2021; the Westlaw cite 4938124 -- the Ninth Circuit looked at a

25   factual attack on standing and found that it was inappropriate

**PROCEEDINGS**

 1   in a stage very similar to this.

 2        And I think that the way that this process is being done,

 3   it's sort of one-sided under General Order 56, where the

 4   defendant can bring case-dispositive motions other than just a

 5   typical 12(b) motion; whereas Mr. Whitaker is unable to bring

 6   anything.

 7        And so, effectively, what we have here is a presumption

 8   that because Mr. Whitaker has a lengthy litigation history,

 9   that's being used against him, and effectively turning it into

10   a prefiling order as if he was a vexatious litigant.

11        **THE COURT:**  No, I don't -- yeah, I understand your

12   objection.  I think you -- I don't know.  I mean, did you make

13   it in writing in this case before?

14        **MR. PRICE:**  We made --

15        **THE COURT:**  Because if you did, I believe I addressed it.

16        **MR. PRICE:**  We made similar arguments in the opposition

17   brief.  They were not phrased in this way.

18        **THE COURT:**  Why not?

19        **MR. PRICE:**  I don't know, Your Honor.  Because they

20   weren't.  I don't know.  I apologize.

21        **THE COURT:**  I mean, we could always just convert it, as

22   well, to a Rule 52 proceeding.  I mean, it's true, with respect

23   to whether an injunction is warranted, it's one and the same.

24        There's no discovery for you to do because there's nothing

25   you need to discover of the defendant.  The discovery is all

**PROCEEDINGS**

1    one-sided of Mr. Whitaker, but they didn't ask for any.  So

2    I guess I don't see how you're prejudiced.  If anything, you're

3    benefited from the fact that, if I am to find that he has shown

4    an imminent, concrete injury, then that's that.  Right?

5        **MR. PRICE:**  Yes.

6        **THE COURT:**  The defendant doesn't get to litigate it

7    again.

8        **MR. PRICE:**  Yes, Your Honor.  If you're suggesting that

9    the Court would sua sponte enter judgment in Mr. Whitaker's

10   favor if it were to find that he had standing here, that would

11   effectively be what would happen under Rule 52.

12       **THE COURT:**  It would address that issue.  It doesn't

13   address the merits.

14       This argument, of course, assumes that there was an ADA

15   violation which has not been resolved.  But certainly, if we

16   try once, whether he has shown, for the purposes of the

17   injunctive relief -- which the Ninth Circuit has held is an

18   Article III requirement, that you also have to show the

19   imminent need or the likelihood to return.  If that's

20   adjudicated in Mr. Whitaker's favor, then we're not going to

21   have another factual trial on that.  So --

22       **MR. PRICE:**  And just one last comment on this, Your Honor.

23       I reread over the order that set this -- originally that

24   stayed this, pending a resolution in the *Curry* cases.

25       I looked at the cases that Your Honor based this on, and

**PROCEEDINGS**

1   those cases all, I would say curiously, but very appropriately,

2   stop at the end of 2020.

3       The reason for that is actually another one of

4   Mr. Whitaker's cases, *Whitaker v. Tesla*, which is binding

5   authority in the Ninth Circuit, which looked at the very

6   language that was alleged in those cases as to constitutional

7   standing, which is what --

8       THE COURT:  But that was a 12(b)(6).  I mean, that was a

9   facial challenge.

10      MR. PRICE:  Yes, Your Honor.  My previous objection is,

11  I think that converting this to a factual challenge without

12  addressing the other merits analysis is inappropriate.

13      THE COURT:  Okay.  All right.  But that was --

14      MR. PRICE:  That's all I meant.

15      THE COURT:  Yeah.  I mean, I held, in my order, that he

16  had properly alleged standing.  And if it was just a facial

17  challenge, then that's that.  I'm not quite sure what we would

18  do next.

19      I mean, the real problem we have here is the parties

20  actually had represented to me that there was a settlement.

21  Apparently, that wasn't true, because if it was true, the

22  plaintiff could have moved to enforce the settlement.  Because

23  the defendant doesn't get to decide, because they change

24  counsel, I don't want to abide by the settlement to which I

25  agreed.

PROCEEDINGS

```
1        So this case has all sorts of procedural -- yeah.  And so
2   that's what was represented to me; and then, out of the blue, I
3   get a stipulation asking to move the joint inspection date
4   without anyone even mentioning the fact that they had
5   represented to me that there had been a settlement.
6        MR. PRICE:  Understood, Your Honor.
7        THE COURT:  All right.  Okay.
8        MR. PRICE:  I'm ready to move forward.
9        THE COURT:  So I don't think there's any prejudice because
10  we're not doing this twice; we're only doing this once.  And
11  the defendant didn't ask for any discovery, and the plaintiff,
12  correctly, hasn't asked for any discovery because there isn't
13  any.  It's all in the plaintiff's hands.
14       Okay.  All right.  Are you prepared, then, to call your
15  witness with that objection noted for --
16       MR. PRICE:  With that, I'm prepared to move forward.
17       Thank you, Your Honor.
18       THE COURT:  Okay.  All right.
19       All right.  Good morning, Mr. Whitaker.  You're on mute.
20       THE WITNESS:  Good morning, Your Honor.
21       THE COURT:  All right.  Mr. Whitaker, I'm going to have
22  Ms. Means place you under oath.
23                        BRIAN WHITAKER,
24  called as a witness for the Plaintiff, having been duly sworn,
25  testified as follows:
```

1        THE WITNESS:  I do.

2        THE CLERK:  Can you just please state your name for the

3   record.

4        THE WITNESS:  Brian Whitaker.

5        THE CLERK:  Thank you.

6        THE COURT:  All right.  Good morning, Mr. Whitaker.

7        And, Mr. Price, why don't you go ahead.

8                      **DIRECT EXAMINATION**

9   BY MR. PRICE:

10  **Q.**   Hi, Mr. Whitaker.  How are you doing today?

11  **A.**   Very well.

12  **Q.**   So we're here on a case that I understand is pronounced

13  Whitaker versus Slainte Bars, an Irish name.  Do you recognize

14  the name of the case?

15  **A.**   Yes, sir.

16  **Q.**   Okay.  Do you know which business that case name

17  corresponds with?

18  **A.**   Yes, sir.

19  **Q.**   Okay.  And what business is that?

20  **A.**   The Alhambra Irish House.

21  **Q.**   And is that a -- is that a business that you can visualize

22  in your mind?  Do you know which we're talking about?

23  **A.**   Yes, sir.

24  **Q.**   Okay.  With that in mind, I just want to talk to you a

25  little bit about a variety of things relating to litigation

**WHITAKER - DIRECT / PRICE**

1    that you've brought in the past as well as sort of your ties to

2    the Bay Area.

3         Let's start with sort of how you started bringing ADA

4    litigation.  When were you first -- when did you first start

5    using a wheelchair?

6    **A.**   September 5th, 1994.

7    **Q.**   And what was the cause of the injury that caused you to

8    start doing that?

9    **A.**   I had a car accident when I was in my freshman year of

10   college.  I was out in Louisiana, and I flipped my vehicle, got

11   thrown from the vehicle and broke my C3-C4 vertebrae.

12   **Q.**   So is that a spinal injury?

13   **A.**   Yes, sir.

14   **Q.**   And when did you first become aware that the ADA provided

15   you certain protections as a person with a disability?

16   **A.**   I believe it had to be the late '90s or the early 2000s.

17   **Q.**   Okay.  And when did you file your first ADA lawsuit?

18   **A.**   I believe early 2000.

19   **Q.**   So was there a period of time when you were aware that you

20   had certain rights but you had not yet filed a lawsuit to

21   enforce them?

22   **A.**   Yes, sir.

23   **Q.**   Can you tell me a little bit about -- let me back up.

24        Can you think of a time in which you asked for help and

25   didn't seek a lawsuit?  Maybe you found something that was

1  non-compliant and you asked somebody to help you as a result.

2  Did that ever occur before you filed any litigation?

3  **A.**   Yes, sir.  Several times.

4  **Q.**   Did you ever find people to blow you off or to not do what

5  they -- what you were asking them to do?

6  **A.**   I found people that had blown me off.  And also, I've

7  complained about things before and it just never gets changed.

8  **Q.**   Did you ever go back later and find out that it was still

9  the same way as you left it?

10  **A.**   Yes, sir.

11  **Q.**   Okay.  Do you remember the first business you sued under

12  the ADA?

13       **MR. SAHELIAN:**  Objection; relevance, Your Honor.

14       **THE COURT:**  Overruled.

15       **THE WITNESS:**  I can't remember the first business, but I

16  know one of the first businesses would be Sizzler.

17  **BY MR. PRICE:**

18  **Q.**   Sizzler.  Where was that Sizzler located?

19  **A.**   That Sizzler was located on Prairie in Inglewood,

20  California.

21  **Q.**   Do you remember what the barrier was there?

22  **A.**   Yes, sir.  The barrier was the piping under the sink

23  wasn't covered and the bathroom stall was not wide enough.

24  **Q.**   Okay.  And so you filed a lawsuit in that case; right?

25  **A.**   Yes, sir.

 1   **Q.**   And did you get the fixes that you were looking for?

 2   **A.**   Yes, I did.

 3   **Q.**   How do you feel about that?

 4   **A.**   I felt really good about it when I went back and they had

 5   remodeled the entire restroom and brought it all the way up to

 6   code.

 7   **Q.**   Would you say the result in that case influenced you

 8   bringing other cases?

 9   **A.**   Absolutely.

10   **Q.**   Do you have any shame in the lawsuits that you bring?

11   **A.**   No shame at all.

12   **Q.**   Do you have pride in them?

13   **A.**   Actually, yes.  I wear it as a badge of honor.  When I go

14   past different places and see that I'm the reason for the

15   change and know that it's accessible for other people in my

16   condition and worse, it makes me feel good.

17   **Q.**   Okay.  So you -- sorry.  You said you go back and you have

18   pride when you see that the thing's been fixed.

19   **A.**   Yeah.  I mean, you know, when I see places that I -- that

20   I visited before and I'll see that the adjustments have been

21   made, it makes me feel good to know that, you know, I'm the

22   reason that that happened.

23   **Q.**   And that stems from you actually returning to the place;

24   right?

25   **A.**   Yes, sir.

**WHITAKER - DIRECT / PRICE**

1  **Q.**   Would you consider yourself an advocate?

2  **A.**   Absolutely.

3  **Q.**   When you bring lawsuits, how do they -- how do they

4  usually resolve?  What's a typical resolution?  I don't want

5  you to talk numbers or anything, but just in general.

6  **A.**   A typical resolution is they'll have to make the fixes

7  first, because that's what we always address first, is the

8  fixes, the remediation; and then, generally, there's a

9  settlement.

10  **Q.**   Have you ever rejected a settlement offer because they

11  weren't willing to make the fix?

12  **A.**   Absolutely.  We don't even talk about -- I don't want to

13  talk about a settlement until we talk about the fixes.

14  **Q.**   So would you say that's a very important thing to you in a

15  case?

16  **A.**   Yes, sir.

17  **Q.**   Let's talk a little bit about the Bay Area.  Now, you --

18  where do you live right now?

19  **A.**   Right now I live in Los Angeles.

20  **Q.**   Okay.  And so that's a -- have you ever driven from

21  Los Angeles to, let's say, San Jose?

22  **A.**   Yes, sir.

23  **Q.**   How long of a drive is that?

24  **A.**   That's about a five-and-a-half-hour drive.

25  **Q.**   It's lengthy, then?

**WHITAKER - DIRECT / PRICE**

1   **A.**   Yes, sir.

2   **Q.**   Okay.  Do you prefer to drive that or fly it?

3   **A.**   Oh, definitely fly.

4   **Q.**   What typically brings you up to the Bay Area?  Let's

5   say -- let's go back.  When was the first time you went to the

6   Bay Area after you started using a wheelchair?  Do you

7   remember?

8   **A.**   I believe 2013.  2013; 2014 maybe.

9   **Q.**   Do you remember what the general area you went to was?

10   **A.**   Yes, sir.

11   **Q.**   Where was that?

12   **A.**   That was downtown Los -- downtown San Francisco.

13   **Q.**   Is there anything about San Francisco you particularly

14   like?  What brings you to San Francisco, and what brought you

15   to it then?

16   **A.**   Well, then it was to be a tourist, basically check it out.

17   That was my first time ever going out there.  I went with a

18   cousin of mine, and we just went out there to check it out.  He

19   had been there before.  It was my first time, and I just was

20   curious, always curious about it.

21   **Q.**   Did you like it?

22   **A.**   Yeah, I definitely did.

23   **Q.**   What kind of stuff do you like to do in San Francisco?

24   **A.**   I enjoy the Wharf, Fisherman's Wharf, the restaurants that

25   they have there.  I actually like the climate.  I like the

1    culture.  The shopping, definitely.  So those are the main

2    things that I enjoy about it.

3    **Q.**   So you find it to be sort of a different atmosphere than

4    where you live now?

5    **A.**   Yes.

6        **MR. SAHELIAN:**  Leading, Your Honor.

7        **THE COURT:**  Sustained.

8    **BY MR. PRICE:**

9    **Q.**   Can you describe ways in which it's different from where

10   you live?

11   **A.**   The culture, the people, the area in general.  You know,

12   other than just downtown San Francisco, it's more wide open.

13   It's less congested once you get out of the downtown area,

14   which I enjoy.

15       And also, just the close proximity to Oakland.  You know,

16   I love the history of Oakland and the culture and the different

17   things that they have going on over there.

18   **Q.**   So how -- do you -- you spend a lot of time in Oakland

19   now?

20   **A.**   Yes, sir.

21   **Q.**   What about the South Bay?  If I say "the South Bay," do

22   you understand what I mean by that?

23   **A.**   The South Bay.  Could you give me, like, an area -- like,

24   a city that's --

25   **Q.**   Let me ask it a little differently.

1          Do you ever go to San Jose?

2     **A.**    Yes, sir, absolutely.

3     **Q.**    Okay.  Colloquially, sometimes people call that area the

4     South Bay.  So --

5     **A.**    Okay.  Yes.

6     **Q.**    Is there anything about San Jose that you like?

7     **A.**    Yeah.  I like the -- I like the ruralness of San Jose.

8     You know, I'm actively looking for a place to relocate out that

9     way, actually; so, you know, I'm pretty much all over that

10    area.  But San Jose, in particular, yeah, I like the ruralness

11    of it, the openness.

12    **Q.**    Are you from California, Brian?  I'm sorry.  Mr. Whitaker.

13    **A.**    Yes.

14    **Q.**    Sorry.  It's just funny.  I'm sort of from the country.

15    So hearing somebody call that rural is funny to me, but I get

16    what you mean.

17    **A.**    Yeah.

18    **Q.**    I grew up around cows, so...

19    **A.**    Yeah.

20    **Q.**    So you said you're looking for places to move.  How long

21    have you been doing that?

22    **A.**    Actively, for, like -- for about the last year and a half.

23    **Q.**    And what's the -- I guess the range of areas you're

24    looking in?  Like, are you looking all over the state or

25    certain parts of it?

1  **A.**   Well, I've been looking basically in the San Francisco

2  area, San Jose, Palo Alto, Sacramento.  You know, so basically

3  all the way from Sacramento to San Francisco.

4  **Q.**   Sacramento's a little different.  Why would you be looking

5  in Sacramento instead of the Bay Area?

6  **A.**   Well, Sacramento, what I like about Sacramento is more of

7  the ruralness, to be honest.  And I think that's where I'm

8  going to -- that's where I'm going to plant my feet, is in that

9  area, actually.

10       But I'm trying to put myself in a situation where it's

11  more safe.  Safety is a prime concern of mine.  And I kind of

12  want to get away from being so congested, and I want to be able

13  to, you know, have room to move around a little, so to speak.

14  **Q.**   Okay.  And so if you moved to Sacramento, how far is that

15  from the Bay?

16  **A.**   About an hour-and-a-half, hour-and-45-minute drive.

17  **Q.**   Okay.  Would you -- would you be more willing to drive

18  that than you currently are with the drive from south

19  Los Angeles -- or south California -- Southern California?

20  **A.**   I would.  I mean, you know, I would be able to --

21  you know, if I wanted to go to San Francisco, I could do that

22  and come back in the same day.

23  **Q.**   So do you -- do you not do that now?  Does it take more

24  than a day for you?

25  **A.**   Typically, yeah.

**WHITAKER - DIRECT / PRICE**

1  Q.   Okay.  What's a typical trip to the Bay look like for you

2  these days?

3  A.   Could you clarify?

4  Q.   Yeah.  Let's say -- well, let's put it into less

5  hypothetical terms.  Do you have a -- do you have a current

6  plan to go to the Bay?  Like, do you have a plane ticket booked

7  right now?

8  A.   Yeah.  I'm actually going to the Bay on Wednesday.

9  Q.   Okay.  And how are you -- how are you getting there?

10  A.   I'm going to fly Southwest.

11  Q.   When are you coming back?

12  A.   Coming back on Thursday.

13  Q.   Okay.  So that's going to be a two-day adventure for you?

14  A.   Yes, sir.

15  Q.   Okay.  And do you have any other tickets planned or maybe

16  less concrete plans to go up there?

17  A.   I don't have any other -- any other tickets planned, but I

18  definitely plan on going back up there probably the

19  following week.

20  Q.   How often do you typically go to the Bay Area from

21  Southern California?

22  A.   In a month, on an average month, I will go out there

23  between two and four times.

24  Q.   So you're up there a lot?

25  A.   Yes, sir.

**WHITAKER - DIRECT / PRICE**

1 | **Q.**   Is there a particular area you tend to go to, or is it
2 | more spread out?
3 | **A.**   It's pretty spread out.  But I would typically fly into
4 | either San Jose, Oakland, or San Francisco.
5 | **Q.**   So you fly into all three of the major airports up there?
6 | **A.**   Oh, I'm sorry.  My apologies.  And Sacramento as well.
7 | **Q.**   Oh, and -- so all four of them, really, then?
8 | **A.**   Yes, sir.
9 | **Q.**   Okay.  If I said the phrase "General Order 56," does that
10 | mean anything to you?
11 | **A.**   Yes, sir.
12 | **Q.**   What does that mean to you?
13 | **A.**   I just know that it's -- it's a -- I don't know exactly
14 | what it means.  It escapes me right now.  But I hear the term
15 | all the time, "General Order 56."
16 | **Q.**   Okay.  And do you understand that to mean anything with
17 | regard to the court system?
18 | **A.**   Yes.  I know it's something regarding the court system,
19 | General Order 56.  You would have to explain it.  I just -- it
20 | just escapes me.
21 | **Q.**   That's fine.  It's sort of a legal term of art in the
22 | area.
23 |       Let me ask.  Does the phrase "joint site inspection" mean
24 | anything to you?
25 | **A.**   Yes.

1    **Q.**   Okay.  What does that mean?  How do you understand that to

2    mean?

3    **A.**   The joint site inspection is when my attorney -- sometimes

4    I would be required to be part of the process -- my attorney,

5    the other attorney meets up at the -- at the business that's --

6    that, you know, we're suing and address the violations.

7    **Q.**   Okay.  So when you go up to the Bay Area, do you ever plan

8    to have to do site inspections when you're up there?

9    **A.**   Yes.  Not only site inspections, but I guess it would

10   be -- it's coming back to me, the General Order 56.  I know

11   that's when we have the meetings -- our side, the other side --

12   and we discuss settlement.

13   **Q.**   Okay.  And you have to participate in those pretty

14   frequently; right?

15   **A.**   Yeah, absolutely.  So the General Order 56s and the joint

16   site inspections, I have a lot of those to deal with.

17   **Q.**   Okay.  So when you -- when you bring a lawsuit, do you --

18   I'm going to rephrase this.

19        What sort of obligations are you aware of when you bring a

20   lawsuit in the Bay Area?

21   **A.**   I'm aware of the General Order 56s, and I'm also aware of

22   the joint site inspections, that I have to be part of these

23   processes during the litigation.

24   **Q.**   Okay.  And so when you have to do those, do you spend time

25   in the area around the businesses that you're visiting?

WHITAKER - DIRECT / PRICE

1    **A.**    Yes, sir.

2    **Q.**    So let's say, for instance -- can you think of one that

3    you've done recently?

4    **A.**    Well, for the most part, they've been -- they've been

5    ones --

6    **Q.**    Oh.  Because of the pandemic; right?

7    **A.**    Yes, sir.

8    **Q.**    But if you were to have to return to a business for a site

9    inspection, would you find yourself having to go to other

10   businesses in the area for a reason?

11   **A.**    Yes.

12       **MR. SAHELIAN:**  Leading, Your Honor.

13       **THE COURT:**  Sustained.

14   BY MR. PRICE:

15   **Q.**    What sort of -- what sort of other activities do you

16   participate in when you're at a business for a site inspection,

17   if any?

18   **A.**    Eating.  Let's see.  Shopping.  What else do I need to do?

19   That would be the -- the majority of things that I would do

20   during --

21   **Q.**    And would that usually happen around the same businesses

22   that you're going to for the site inspection?

23   **A.**    Yes, sir.

24   **Q.**    And does that typically take you to other businesses in

25   the area?

**WHITAKER - DIRECT / PRICE**

1  **A.**   Yes.

2      **MR. SAHELIAN:**  Leading, Your Honor.

3      **THE COURT:**  Sustained.

4  **BY MR. PRICE:**

5  **Q.**   Where do you -- where do you typically -- what sort of

6  places would you have to eat if you were eating in the same

7  area as the site inspection?

8  **A.**   Different restaurants that would be in the area in close

9  proximity.

10 **Q.**   And those are -- those are public businesses?

11 **A.**   Yes, sir.

12 **Q.**   Okay.  And where would you shop if you were shopping in

13 the area around the site inspection?

14 **A.**   Any of the businesses that are in close proximity.

15 Clothing, I'm very into fashion.  You know, all across the

16 board, though, when it comes to shopping.

17 **Q.**   And those are other public businesses that have those

18 services?

19 **A.**   Yes, sir.

20 **Q.**   When you have done such things, either gone eating or

21 shopping when you were around an area for a site inspection

22 associated with a case you've ever brought, have you ever

23 encountered other barriers at those businesses?

24 **A.**   Yes, sir.

25 **Q.**   Okay.  And has that led to other lawsuits in the same

WHITAKER - DIRECT / PRICE

1    area?

2    **A.**    Yes.

3    **Q.**    Okay.  And would those lawsuits, then, in turn, require

4    you to also come back for other events?

5    **A.**    Absolutely.  But I just want to just expound upon that.

6         Not just joint site inspections or General Order 56s.

7    You know, when I'm just out and about, you know, looking at

8    areas to stay at currently, you know, I'm constantly running

9    into businesses and restaurants and, you know, different other

10   places that I go to patronize.

11   **Q.**    Okay.  So you mentioned that you fly into several

12   different airports.  Have you ever had the occasion that you've

13   flown into the San Jose Airport and driven to other parts of

14   the Bay?

15   **A.**    Yes, sir.

16        **MR. SAHELIAN:**  Leading, Your Honor.

17        **THE COURT:**  Overruled.

18   **BY MR. PRICE:**

19   **Q.**    Okay.  Have you ever had to drive to San Francisco from

20   San Jose?

21   **A.**    Yes, sir.

22   **Q.**    Can you name any cities between San Jose and

23   San Francisco?

24   **A.**    Yes, sir.  Santa Clara; Palo Alto; Menlo Park; Burlingame;

25   Redwood City, of course; San Mateo; San Bruno.  You know, it's

**WHITAKER - DIRECT / PRICE**

1   a lot of --

2   **Q.**   There's a few, huh?

3   **A.**   Yes, sir.

4   **Q.**   You mentioned Redwood City.  Relative to San Francisco and

5   San Jose, where would you say Redwood City is located?

6   **A.**   Redwood City would be -- it's kind of like the mid- --

7   like the midway point, pretty much, between San Jose and

8   San Francisco.

9   **Q.**   Okay.  So how many times do you think you've driven

10  through Redwood City, either driving to or from San Francisco?

11  **A.**   I'd say at least six; six or seven times.

12  **Q.**   Do you imagine that you're going to do that again?

13  **A.**   Yes, sir.

14  **Q.**   Okay.  Have you ever stopped in Redwood City during one of

15  those trips to and from San Francisco and San Jose?

16  **A.**   Yes, sir.

17  **Q.**   Do you imagine you're going to do that again?

18  **A.**   Yes, sir.

19  **Q.**   And why would you do that?

20  **A.**   You know, like I said, I like to shop and I like to eat.

21  I mean, you know, so Redwood City would definitely be along

22  that path.  You know, if I -- if I chose to, you know, pull off

23  there, you know, I would.

24  **Q.**   Understood.

25  **A.**   I like Redwood City, yeah.

**WHITAKER - DIRECT / PRICE**

1   **Q.**   What is it you like about Redwood City?

2   **A.**   It has, like, a -- like, a hometown feel.  Although I'm

3   from Los Angeles, I actually graduated high school in a small

4   town in Texas, and it gives me, like, that type of feel.  I

5   actually like that.  Although it's not that small, but it has

6   that type of feel.

7   **Q.**   So I want to talk about the Irish House that's the subject

8   of this lawsuit.

9        Earlier, you said you had a memory of that place.  Why did

10  you sue the business the Irish House?

11  **A.**   The Irish House, it didn't have any accessible tables

12  outside.  There were actually tables that were in the street.

13  You know, they had a street setup; I mean, tables set up in the

14  street.  And then, also, on the sidewalk they had, almost like

15  beer kegs, like big beer kegs that were set up as tables that

16  were only bar-stool height.  And then, so those weren't

17  accessible.

18       And then the tables that were actually in the street, they

19  weren't accessible because of the style of the tables.  They

20  had the metal pole in the middle of the table which wouldn't

21  allow me access.

22       But I couldn't even get down to the street.  There was no

23  access to the street, actually, from the sidewalk to get to

24  those tables.

25  **Q.**   Gotcha.  So...

1        (Pause.)

2        **MR. PRICE:**  I didn't hear the answer.  I don't know if he

3   heard my question or not.

4        **THE COURT:**  Why don't you -- he answered your question,

5   but if you didn't hear it, maybe the court reporter can read

6   Mr. Whitaker's answer back.  Thank you.

7        Oh, we can't hear you, Ms. Dub.

8        Why don't you just ask again, Mr. Price.

9        **MR. PRICE:**  That's fine.

10  **Q.**   Do you have any preference for eating indoors versus

11  outdoors?

12  **A.**   Depends on the day.

13  **Q.**   Why?

14  **A.**   I like to eat outside.  I definitely love the sun, the

15  atmosphere.

16  **Q.**   What are some of the reasons why you might decide to eat

17  outside instead of inside?

18  **A.**   The weather, if the weather permits.

19  **Q.**   So when you went to the pub house, the Irish House -- I'm

20  trying to refer to the same business here -- were you aware

21  that there was not going to be outdoor seating?

22  **A.**   No, sir.

23  **Q.**   I'm sorry.  After you went there, were you aware that

24  there was not outdoor seating?

25  **A.**   Yes.  Yes.

**WHITAKER - DIRECT / PRICE**

1  **Q.**   And do you believe that if you went there a week later,

2  that they would have outdoor seating again?

3  **A.**   Could you -- could you clarify?

4  **Q.**   Do you have any reason to think that if you'd come back

5  a week later, that things would have been different?

6  **A.**   Oh.  No, sir.

7  **Q.**   What about a month later?

8  **A.**   No.

9  **Q.**   Do you believe that anything would have been different if

10  you hadn't filed a lawsuit?

11  **A.**   I know nothing would have been different.

12      But, no, I don't believe at all that it would be

13  different.

14  **Q.**   So is there any reason why you would -- you would plan to

15  return to that specific place until after you found out that it

16  had been fixed?

17  **A.**   No.

18  **Q.**   Okay.  You claim that -- would you say that you were

19  deterred from going back?

20  **A.**   Absolutely.

21      **MR. SAHELIAN:**  Leading, Your Honor.

22      **THE COURT:**  Sustained.

23  **BY MR. PRICE:**

24  **Q.**   When you're aware of a business not being compliant, what

25  is the effect that has on you?

**WHITAKER - CROSS / SAHELIAN**

1    **A.**    Makes me not want to go back to the -- to the business.

2    **Q.**    Okay.  And what would change your willingness to go back

3    to the business?

4    **A.**    For it to be fixed.

5        **MR. PRICE:**  I'm just looking to see if I've got anything

6    else to ask you.

7                        (Pause in proceedings.)

8    **BY MR. PRICE:**

9    **Q.**    Have you previously sued businesses for lack of outdoor

10   seating?

11   **A.**    Yes, sir.

12   **Q.**    Have you gotten corrections in those conditions?

13   **A.**    Yes, I have.

14       **MR. PRICE:**  I don't think I have any further questions.

15   Thank you, Mr. Whitaker.

16       **THE COURT:**  All right.  Thank you.

17   Mr. Sahelian?

18       **MR. SAHELIAN:**  Good morning, Your Honor.  Thank you very

19   much.

20                     **CROSS-EXAMINATION**

21   **BY MR. SAHELIAN:**

22   **Q.**    Mr. Whitaker, you and I know each other quite well, don't

23   we?

24   **A.**    Yes, sir, we're familiar.

25   **Q.**    In fact, we had a trial a few weeks ago together.  Do you

1    remember that?

2    **A.**    I do.

3    **Q.**    Do you know what the outcome of the trial was?

4    **A.**    Yes.

5         **MR. PRICE:**   Objection; relevance.

6         **THE COURT:**   What is -- I don't know.  What's the relevance

7    of that?

8    **BY MR. SAHELIAN:**

9    **Q.**   Okay.  Do you remember what case it was, Mr. Whitaker?

10        **MR. PRICE:**   Objection; relevance.

11        **THE COURT:**   Well, is this to lay a foundation to admit his

12   testimony from the trial?

13        **MR. SAHELIAN:**   You know, we can come back to that,

14   Your Honor.

15        **THE COURT:**   Okay.

16        **MR. SAHELIAN:**   That's fine.

17   **Q.**   So, Mr. Whitaker, going over your testimony of just a

18   few minutes ago here, if I were to summarize, a few of the

19   highlights is that you enjoy the San Francisco area but you're

20   not sure whether you actually enjoy the City, whether you like

21   San Jose, Palo Alto, Sacramento, or even other areas.  Is that

22   correct?  You haven't made up your mind yet; is that correct?

23   **A.**    Made up my mind whether I enjoy them or not?

24   **Q.**    As to which area you like the most.

25   **A.**    I like all the areas, sir.

1  Q.   Have you made up your mind as to which area you like the

2  most?

3  A.   No.

4  Q.   When do you think you'll make up your mind?

5      **MR. PRICE:**  Objection; relevance.

6      **THE COURT:**  Sustained.

7  **BY MR. SAHELIAN:**

8  Q.   Okay.  You also said that filing ADA lawsuits is a badge

9  of honor for you; correct?

10  A.   Absolutely.

11  Q.   And you said that it feels good to return to see changes;

12  correct?

13  A.   Yes, sir.

14  Q.   Okay.  So we're going to focus on these two major areas

15  that you brought up in your opening testimony.

16      But before that, I'd like to ask you a few questions about

17  your current residence.  Where do you live currently?

18  A.   Los Angeles.

19  Q.   Where in Los Angeles?

20  A.   The exact address?  11848 --

21      **THE COURT:**  You don't have to give the exact address.

22  Just the town is fine.

23  **BY MR. SAHELIAN:**

24  Q.   You're in West L.A.; is that correct?

25  A.   Yes, sir.

1    Q.    Okay.  Do you lease or have you bought your property that

2    you live in?

3         MR. PRICE:  Objection; relevance.

4         THE COURT:  What's the relevance here?

5         MR. SAHELIAN:  Well, Your Honor, he wants to move to -- to

6    the Bay Area.  If he's got a three-year lease at his current --

7         THE COURT:  Okay.  All right.  Overruled.

8         You can answer, Mr. Whitaker.

9         THE WITNESS:  I lease.

10   BY MR. SAHELIAN:

11   Q.    What's the duration of your lease?

12   A.    My --

13        MR. PRICE:  Objection; relevance.  Objection; California

14   constitutional right to privacy.

15        THE COURT:  Overruled.

16        THE WITNESS:  My lease is up in October.

17   BY MR. SAHELIAN:

18   Q.    Of what year, sir?

19   A.    2022.

20   Q.    And prior to being in this area, you were, I believe, in

21   downtown; correct?

22   A.    Yes, sir.

23   Q.    Okay.  And that was what?  About 15 minutes from

24   West L.A.?

25   A.    Correct.

1    **Q.**    Okay.  Why did you move from downtown to West L.A.?

2         **MR. PRICE:**  Objection; relevance.

3         **THE COURT:**  Overruled.

4         **THE WITNESS:**  Just the environment was -- was getting

5    pretty volatile after George Floyd and the riots and

6    everything.

7    **BY MR. SAHELIAN:**

8    **Q.**    So October of 2022 is a few months away, Mr. Whitaker.  Do

9    you -- do you plan to -- do you plan to lease or purchase

10   property in Northern California prior to October of '22?

11   **A.**    I plan to move out that way at the end of my lease.

12   **Q.**    At the end of your lease.  So you're not going to be there

13   permanently, based on your testimony now, prior to -- when I

14   say "be there," I mean in the Bay Area.  You're not relocating

15   prior to October of 2022; is that correct?

16   **A.**    I can't say that.  I just -- I can just say with

17   definity [sic] that by that time, I will be -- I will have

18   relocated to the Bay Area.

19   **Q.**    Okay.  Do you plan to lease two properties at the same

20   time?

21        **MR. PRICE:**  Objection; relevance.

22        **THE COURT:**  Overruled.

23        **THE WITNESS:**  If need be.

24   **BY MR. SAHELIAN:**

25   **Q.**    Why would there be a need?

1   **A.**   If I find a place prior -- prior to the time and I move.

2   **Q.**   Okay.  So are you in a financial position to pay rent on

3   two properties simultaneously?

4       **MR. PRICE:**  Objection --

5       **THE COURT:**  Sustained.

6       **MR. PRICE:**  -- California --

7       **THE COURT:**  It's okay.  Sustained.

8       Next question.

9   **BY MR. SAHELIAN:**

10   **Q.**   All right.  So I believe I took your deposition a

11   few months ago, Mr. Whitaker, if you recall.  And you testified

12   about the same as you did today, that you make two to three

13   trips to Northern California -- is that correct? --

14   every month?

15   **A.**   Yes, sir.

16   **Q.**   And that you said that advocacy is your primary reason;

17   correct?

18   **A.**   Is my primary reason to travel to the Bay Area?

19   **Q.**   Correct.

20   **A.**   Never said that, no, sir.

21   **Q.**   So advocacy -- ADA advocacy is not your primary reason for

22   visiting the San Francisco area?

23   **A.**   That's not my primary reason, no.

24   **Q.**   What is your primary reason?

25   **A.**   My primary reason is I'm looking to relocate to the area

1   and I'm canvassing the different areas to see where I want to

2   go.

3   **Q.**   Does your advocacy factor in at all?

4   **A.**   Very minimal.

5   **Q.**   Okay.  Well, that's not what you told me when I took your

6   deposition.  In fact, on page 14 and 16, you listed advocacy --

7        **THE COURT:**  So, Mr. Sahelian, could you please refer to

8   the page number of your exhibit, which is 297 pages.  So what

9   page are you referring to?

10       **MR. SAHELIAN:**  Okay.  So this would be, Your Honor, the

11  deposition taken in the Goltz case, and it would be page 14 of

12  that deposition.  But I see what Your Honor is asking for.

13       **THE COURT:**  So that Mr. Price could see it as well.

14       **MR. SAHELIAN:**  Okay.  Does Mr. Price have a -- I e-mailed

15  a copy of that transcript to Mr. Price.  Actually, to his

16  office.

17       **MR. PRICE:**  I do not personally have it.  I can probably

18  find it.  But, no, I don't have --

19       **THE COURT:**  All I have is the exhibit that you sent --

20       **MR. SAHELIAN:**  Correct, Your Honor.

21       **THE COURT:**  -- which is 297 pages.

22       So I just need to know where to go there.

23       **MR. SAHELIAN:**  Okay.  Your Honor, can we take a break for

24  one moment to see if Mr. Price can locate the deposition

25  transcript that I e-mailed?

1      **MR. PRICE:**  I think I found a copy of it on my own end.

2  Is this the November 11th deposition?

3      **MR. SAHELIAN:**  Yes.

4      **MR. PRICE:**  And what page?  I just want to make sure I

5  have the same document.

6      **MR. SAHELIAN:**  Page 14.

7      **MR. PRICE:**  Okay.  And can you give me a line on that so I

8  can confirm it's the right document?

9      I guess the top of the page (as read):

10         ". . . the purpose of traveling up north two or

11      three times a month?"

12      **MR. SAHELIAN:**  Correct.

13      **MR. PRICE:**  Okay.  I have a copy of that in front of me.

14      **MR. SAHELIAN:**  And line 7, he says he's "looking for

15  compliance."  Do you see that?

16      **MR. PRICE:**  Let me see.  I just closed it on accident.

17      Okay.  I see the document, yes.

18      **MR. SAHELIAN:**  Yeah.

19  **Q.**   And, Mr. Whitaker --

20      **THE COURT:**  Wait, wait, wait.  What about me?

21      **MR. SAHELIAN:**  Oh.

22      **THE COURT:**  I'm just the judge.  Where can I find it in

23  this 297-page exhibit?

24      **MR. SAHELIAN:**  Oh, gosh.  Your Honor, what -- I think what

25  I should do -- what I did was combine, all into one exhibit,

1   the -- the trial transcript and the deposition transcript.  And

2   if the Court would like, I could separate them and send them

3   separately to chambers.

4        **THE COURT:**  I have it in front of me right now, what you

5   submitted.

6        **MR. SAHELIAN:**  Okay.  So --

7        **THE COURT:**  Is it the first document or the second

8   document or the third document?

9        **MR. SAHELIAN:**  Okay.  The first document is the Goltz

10  deposition, Your Honor; the second document is a trial

11  transcript; and the third document is the order on trial.

12       **THE COURT:**  So you're referring to the first document?

13       **MR. SAHELIAN:**  Yes, Your Honor.

14       **THE COURT:**  And page 14?

15       **MR. SAHELIAN:**  Page 14, yeah.

16       **THE COURT:**  Okay.  I have that.

17       Okay.  Go ahead.

18       **MR. SAHELIAN:**  All right.

19  **Q.**  Mr. Whitaker, so would you agree with me that your

20  advocacy was one of the factors that you mentioned in reference

21  to your trips to San Francisco?

22  **A.**  I wouldn't agree with you.  I mean, if you want to tell me

23  what I said, I'm all ears.

24       **MR. PRICE:**  I'm not in the same room with Mr. Whitaker.

25  He doesn't have the documents I have.

**WHITAKER - CROSS / SAHELIAN**

1    **THE COURT:**  No, I understand.  His memory can't be

2    refreshed.

3    **BY MR. SAHELIAN:**

4    **Q.**   All right.  Mr. Whitaker, if you recall, at that

5    deposition you mentioned that you were seriously considering

6    relocating to the Bay Area.  Do you recall that?

7    **A.**   Yes, sir.

8    **Q.**   And I asked you if you'd talked to any real estate agents.

9    Do you recall your answer?

10   **A.**   I do recall my answer.

11       I was waiting for you to refresh me about what I said

12   about advocacy being my motivation.

13   **Q.**   What was your answer when I asked you whether you had seen

14   any real estate agents?

15   **A.**   I said "no."

16   **Q.**   Okay.  I asked you whether you had looked at any homes

17   online.  What was your answer?

18   **A.**   I believe it was "no."

19   **Q.**   Okay.  I asked you if you had visited a single open house.

20   What was your answer?

21   **A.**   No.

22   **Q.**   Okay.  I asked you if you had been inside a single rental.

23   What was your answer?

24   **A.**   No.

25   **Q.**   I asked you if you had spoken to a single real estate

1    agent, a rental agent.  What do you think was your answer?

2    **A.**    My answer was "no," of course.

3    **Q.**    All right.

4    **A.**    May I elaborate?

5    **Q.**    It's up to the judge.

6         **THE COURT:**  Your attorney can ask you follow-up questions.

7         **THE WITNESS:**  Okay.  Thank you, Your Honor.

8    **BY MR. SAHELIAN:**

9    **Q.**    Now, you and I have a long history together, Mr. Whitaker;

10   correct?

11   **A.**    We're familiar with each other.

12   **Q.**    All right.  We've -- I've taken your deposition on a

13   number of cases; correct?

14   **A.**    Yes, sir.

15   **Q.**    Okay.  Do you remember the first case you and I met each

16   other?

17   **A.**    I do.

18   **Q.**    Which one was it?

19   **A.**    Whitaker versus Il Fornaio.

20   **Q.**    I'm afraid you're wrong on that.  The first case was a

21   Westchester Mobile in -- near the Los Angeles Airport.  Do you

22   remember?

23   **A.**    Yes.  Yes, sir, I remember.

24   **Q.**    Do you remember I took your deposition on the sixth-floor

25   conference room?

1   **A.**   I do.

2   **Q.**   Okay.  And I asked you why you had gone all the way to a

3   gas station to -- strike that.

4        I asked you why you were in the neighborhood.  Do you

5   remember what your answer was?

6   **A.**   I do.

7   **Q.**   What was it?

8   **A.**   I have a friend who lives right there.

9   **Q.**   Very good.  And --

10  **A.**   It's not hard to remember the truth.

11  **Q.**   Good.  Good.

12       And you mentioned also that you went in to buy what?

13  **A.**   Some chips, Sprite, and I believe some candy.

14  **Q.**   Okay.  Have you been back since?

15  **A.**   No, sir.

16  **Q.**   Okay.  Because I called my client yesterday.  I asked him

17  if he recalled seeing you again, and he said no, he --

18       **MR. PRICE:**  Objection.  Counsel is testifying.

19       **THE COURT:**  Sustained.

20       He just testified that he hadn't been back, Mr. Sahelian.

21       **MR. SAHELIAN:**  Understood.

22  **Q.**   And what would be a reason, Mr. Whitaker, for you not

23  wanting to go back?

24       **MR. PRICE:**  Objection; relevance.  Under *D'Lil*, this is

25  completely inappropriate for standing in this case.

1          THE COURT:  Under -- overruled.

2          THE WITNESS:  There's no reason that I wouldn't want to go

3     back.

4     BY MR. SAHELIAN:

5     Q.   Why haven't you been back?

6     A.   Well, my friend hasn't thrown another function, and I

7     haven't caught the bus over there since then.

8     Q.   When you did file the lawsuit, you asked for a federal

9     judge to take time --

10         MR. PRICE:  Objection; argumentative.

11         THE COURT:  Sustained.

12    BY MR. SAHELIAN:

13    Q.   When you filed the lawsuit, Mr. Whitaker, you said that

14    you were imminently harmed, did you not?

15    A.   I can't recall.

16    Q.   Okay.  Well, you said you wanted to go back and have your

17    chips and soda, or something to that effect; correct?

18    A.   I can't recall.

19    Q.   Well, isn't that what your complaint said, is that you

20    were being prevented from going back and having your chips and

21    soda?

22    A.   I don't believe it said that.

23    Q.   Okay.  What did it say, in your mind?

24    A.   Maybe you can tell me.  I don't have the document, sir.

25    Q.   Okay.  Well, you filed a complaint against the gas

1   station.  Okay?  What was the --

2       **THE COURT:**  So, Mr. Sahelian, I think this is correct;

3   this is argument.  It's an argument you can make when we have

4   closing arguments; right?  He alleged whatever he alleged in

5   the complaint, and he did testify truthfully that he's never

6   been back.

7       **MR. SAHELIAN:**  Okay.  Thank you, Your Honor.

8   **Q.**  Now, Mr. Whitaker, you recently filed suit against a

9   restaurant called Rabano.  Do you recall that?

10  **A.**  Rabano.  Yes, the name rings a bell.

11  **Q.**  Okay.  Can you tell me what area that was in?

12      **MR. PRICE:**  Objection; relevance to this case.

13      **THE COURT:**  Overruled.

14      **THE WITNESS:**  Rabano.  I believe it was in Redwood City.

15  **BY MR. SAHELIAN:**

16  **Q.**  Do you remember where it was?

17  **A.**  No, I don't.

18  **Q.**  Okay.  I'll refresh your memory.  It was in Hermosa Beach.

19  Do you remember the Rabano now?

20  **A.**  Yes, sir, I do.

21  **Q.**  Okay.  Do you recall why you filed suit against Rabano?

22  **A.**  Yes, sir.  Inaccessible tables.

23  **Q.**  Okay.  Where did you want to dine at Rabano's?  Inside or

24  out?

25  **A.**  Rabano, I believe it was inside.

1   **Q.**   Okay.  Well, your complaint said outside, but I'll leave

2   that to your counsel.

3        I will submit to you that we prevailed on summary

4   judgment.

5        Now, you went there on February 27 of 2020.  Have you been

6   back there since?

7   **A.**   I don't believe so.

8   **Q.**   Okay.  Now, you -- you haven't been back and it's almost

9   two years.  What's the reason?

10  **A.**   I would have to be refreshed with the case, to be honest.

11  **Q.**   Okay.  All right.  Now, when you lived downtown -- and I

12  mean downtown and not West L.A. -- you filed suit against a

13  small pizza shop.  Do you remember that?

14  **A.**   Not just from that phrase, no, sir.

15      **MR. SAHELIAN:**  Your Honor, I think the screen was frozen

16  for a moment.

17      **THE COURT:**  Okay.  I don't think it is now.  Did you not

18  hear him?

19      **MR. SAHELIAN:**  Okay.  I didn't hear his response.

20  **Q.**   Do you recall suing a restaurant called Pizza Italia,

21  Mr. Whitaker?

22  **A.**   What was the name of it, sir?

23  **Q.**   Pizza Italia at 311 West Seventh Street.

24  **A.**   Pizza Italia.  I would have to be refreshed.

25  **Q.**   Okay.  You filed suit in February of 2021.  I will submit

1   to you that the case was dismissed as moot from the district

2   court.  Have you been back there?

3   **A.**   I would have to be refreshed.  I mean, but I'm pretty sure

4   I've been back there by it being in close proximity to my home

5   if it was on Seventh Street.

6   **Q.**   Okay.  Have you gone --

7   **A.**   I lived on Fifth Street.

8   **Q.**   -- back to dine at Pizza Italia?

9   **A.**   I can't recall.

10  **Q.**   I believe -- and this is -- this is important at this

11  point that we establish this.

12       On page 87 of the Goltz deposition -- not the trial

13  transcript, Your Honor, but the deposition -- I asked you if --

14       **MR. PRICE:**  Sorry.  I don't have a page 87 of the Goltz

15  deposition.  It only goes to page 61.

16       **THE COURT:**  Yes.  Mine stops at 61 as well.

17       **MR. SAHELIAN:**  Well, that's not good.

18       Oh, I apologize.  That would be the trial transcript.

19       **THE COURT:**  So you're referring us to page 61 of the trial

20  transcript?

21       **MR. SAHELIAN:**  Page 87 of the trial transcript,

22  Your Honor.

23       **MR. PRICE:**  I'm looking to see if I have -- I'm not sure I

24  have the trial transcript.

25       **MR. SAHELIAN:**  I -- I did e-mail it to your office,

 1   Mr. Price.

 2        **MR. PRICE:**  I can't speak to that.  You didn't e-mail it

 3   to me.

 4        **MR. SAHELIAN:**  Well, I e-mailed it to the e-mail account

 5   you've designated for things like this, which would be

 6   serve@potterhandy.com.

 7        **MR. PRICE:**  I'm looking to see if I can find that.  Do you

 8   remember the date that you sent it?

 9        **MR. SAHELIAN:**  It was immediately after they were served

10   on chambers.

11        I think -- oh, I see.  Anyway...

12        **MR. PRICE:**  I mean, from that information, I can't find

13   the document.  I would just ask that you send it to me.  I

14   don't know when you sent it, and I don't have a way of pulling

15   that up real time at this moment.

16        **THE COURT:**  I think it would have been February 3rd.

17        **MR. PRICE:**  Yeah.

18        **MR. SAHELIAN:**  It was in the same package as the other.

19        **MR. PRICE:**  I may be looking in the wrong matter.

20        **MR. SAHELIAN:**  And Mr. Seabock received a copy as well.

21        **MR. PRICE:**  I'm looking here.

22                         (Pause in proceedings.)

23        **MR. PRICE:**  Okay.  Is it -- I think I found the e-mail.

24   So is it all in one document?

25        **MR. SAHELIAN:**  Yes, Mr. Price, it is.  And so for the

1    trial -- the trial transcript follows the deposition.

2         **THE COURT:**  It's around page 158 of the 297-page exhibit.

3         **MR. SAHELIAN:**  So --

4         **MR. PRICE:**  Oh, this is the Pachanga trial transcript.

5         **MR. SAHELIAN:**  Correct.  Correct.

6         **MR. PRICE:**  Okay.

7         **MR. SAHELIAN:**  So you're --

8         **MR. PRICE:**  Page 87.  Okay.

9         **MR. SAHELIAN:**  Correct.

10        **MR. PRICE:**  I have it now.  Mr. Whitaker does not have it.

11        **MR. SAHELIAN:**  Did you wish to take a moment to send it to

12   Mr. Whitaker?

13        **THE COURT:**  Why don't we just go forward.

14        **MR. SAHELIAN:**  Okay.

15        **THE COURT:**  They were produced according to the pretrial

16   order.  So...

17        **MR. SAHELIAN:**  So may I resume, Your Honor?

18        **THE COURT:**  Yes, please.

19   **BY MR. SAHELIAN:**

20   **Q.**   All right.  So, Mr. Whitaker, on page 87, you said -- you

21   said you could name places in your head of places that you

22   revisited but you can't -- you can't give me a number, an exact

23   number of places you've actually revisited, suggesting

24   revisited after suing.

25        And I asked you:  Do you have any records at all anywhere,

1    any notes that you've taken of anywhere that you've revisited?

2         Do you remember your answer?

3    **A.**   Yes, sir.

4    **Q.**   What was it?

5    **A.**   No.

6    **Q.**   Okay.  So you're relying entirely on memory; correct?

7    **A.**   Yes, sir.

8    **Q.**   And you've filed 2,000 lawsuits; correct?

9    **A.**   Around there.  Not sure.

10   **Q.**   Okay.  At the time I took your deposition, you were up to

11   about 15-, 1,600; but since then, I believe you've filed quite

12   a number in the -- in the -- in the Northern District.

13        So -- and you repeated your answer; and you said, "No

14   records; no records of any kind at all," on page 88, and that

15   your only notes were mental, again, on page 88.

16        Could you confirm that?

17   **A.**   Well, since then, I have jotted down some places that I've

18   revisited.

19   **Q.**   Since then.  And where have you jotted this down, sir?

20   **A.**   In my phone.

21   **Q.**   Of new cases, or your recollection of some of the old

22   cases?

23   **A.**   Just recollection of some of the old cases.

24   **Q.**   I see.  How many, out of the 2,000, have you jotted down

25   notes on?

1    **A.**    Maybe five or six just the other day -- well, not the

2    other day, but about a month ago -- that I revisited a mall

3    that I went into; and I was just note-taking some of the places

4    that had made the fixes, that I was happy about.

5    **Q.**    I see.  So out of the 2,000 cases that you've filed, you

6    have notes on five or six that you've revisited.  And the

7    balance, meaning over 1,900, are all committed to memory;

8    correct?

9    **A.**    Yes, sir.

10   **Q.**    Would you consider yourself to have a photographic memory?

11   **A.**    No, sir.

12   **Q.**    Would you consider yourself to have an extraordinary

13   memory?

14   **A.**    No, sir.

15   **Q.**    Do you have any receipts of places that you've patronized

16   after suing, having purchased products or food?

17       **MR. PRICE:**  Objection.  I want to reiterate my objection

18   under *D'Lil* that evidence of standing in other cases is not

19   relevant to evidence of standing in this one.

20       **THE COURT:**  No.  Of course it's relevant.  If he's sued

21   2,000 businesses and he's never returned to any of them, how

22   can that not be relevant to the question of whether he intends

23   to return to the business sued here?

24       **MR. PRICE:**  Respectfully, because the Ninth Circuit

25   explicitly said so.  This is the exact same line of attack that

1   was done in *D'Lil v. Best Western*, and it was rejected.

2        **THE COURT:**  Well, I can look at that, but we can take the

3   evidence.

4        So, go ahead.

5   **BY MR. SAHELIAN:**

6   **Q.**   All right.  Mr. Whitaker, you enjoy marijuana; correct?

7   **A.**   No, sir.

8        **MR. PRICE:**  Objection.

9        **THE COURT:**  Sustained.

10  **BY MR. SAHELIAN:**

11  **Q.**   Did you not sue a marijuana dispensary called the

12  Green Easy on Beverly Boulevard?

13  **A.**   Yes.

14  **Q.**   I believe you filed a lawsuit in June of 2019.  Do you

15  recall?

16  **A.**   I don't recall the date.

17  **Q.**   And I believe at a deposition, I asked you whether you

18  recalled any -- suing any marijuana dispensaries, and you named

19  a few others.  Could you name those that you had mentioned at

20  the deposition?

21       **MR. PRICE:**  Objection; relevance, harassing.

22       **THE COURT:**  What's the point?

23       **MR. SAHELIAN:**  Well, same thing.

24  **Q.**   Mr. Whitaker, have you been back to the Green Easy after

25  you sued?

1   **A.**   I'm not sure if I've been back to the Green Easy, but I

2   know that I've been back to the MedMen marijuana dispensaries

3   that I've sued, which is several of those.

4   **Q.**   That's consistent with your answer.

5       So any reason -- any reason why since June of 2019 you

6   have not been back to revisit the Green Easy?

7       **MR. PRICE:**  Objection; relevance.

8       **THE COURT:**  Overruled.

9       **THE WITNESS:**  I can't say with certainty that I haven't --

10  that I have or I haven't been back to the Green Easy.  I'm

11  not -- I have to be refreshed with what actual marijuana

12  dispensary that is.

13  **BY MR. SAHELIAN:**

14  **Q.**   I see.  And so the fact that it's on

15  8311 Beverly Boulevard is not enough to refresh your memory?

16  **A.**   No, sir.

17  **Q.**   What would -- what would help you refresh your memory?

18  **A.**   Photos.

19  **Q.**   I see.  And you don't keep those on your phone?

20  **A.**   No, sir.

21  **Q.**   Okay.  What do you do with the photos you take,

22  Mr. Whitaker?

23  **A.**   What do you mean?

24  **Q.**   Well, do you delete them, or do you store them somewhere?

25  **A.**   Oh, no, sir.

1      **MR. PRICE:**  Objection; relevance, foundation.

2      **THE COURT:**  Sustained.

3      Next question.

4  **BY MR. SAHELIAN:**

5  **Q.**   Okay.  Do you recall suing a Pachanga Mexican Grill,

6  Mr. Whitaker?

7  **A.**   Yes, sir.

8  **Q.**   1590 Rosecrans in Manhattan Beach?

9  **A.**   Yes, sir.

10  **Q.**   Okay.  That's the subject of the trial we had in December,

11  if you recall; correct?

12  **A.**   Mm-hmm.

13  **Q.**   Okay.  And do you recall testifying at trial that you had

14  not gone back to visit?

15      **MR. PRICE:**  Objection; relevance.

16      **THE COURT:**  Overruled.

17      **THE WITNESS:**  Before I answer the next question,

18  Your Honor, I just want to clarify.  I misunderstood what he

19  said about the photos.  I do have the photos that I take on my

20  phone.

21      **THE COURT:**  Okay.  Thank you.

22  **BY MR. SAHELIAN:**

23  **Q.**   So at trial, again, you testified that you had not gone

24  back to visit -- correct? -- the Pachanga Mexican Grill after

25  suing?

**WHITAKER - CROSS / SAHELIAN**

1    **A.**    I believe so.

2    **Q.**    Okay.  And it had been over two years; correct?

3    **A.**    I'm not sure about the time frame, but I will rely on your

4    memory.

5    **Q.**    Okay.  And you also mentioned that you had sued more than

6    one business in that same shopping center on your single visit

7    that day.

8         Could you name the other four businesses you had sued in

9    that same shopping center on that same afternoon?

10   **A.**    I can't recall.

11   **Q.**    Okay.  How about a hummus restaurant?  Do you recall that?

12   **A.**    What was the name of it?

13   **Q.**    It was a hummus -- it had "hummus" in its name.

14   **A.**    Do you recall the name of it?

15   **Q.**    I don't have it at my fingertips right now.

16        What about the Subway store?

17   **A.**    What about it?

18   **Q.**    Do you recall suing -- mentioning that you had sued the

19   Subway store at that same shopping center on the same day?

20   **A.**    I can't recall.

21   **Q.**    Okay.  A Massage Envy?

22   **A.**    Yes, I recall Massage Envy.  Yes, I do --

23   **Q.**    Okay.

24   **A.**    -- yeah.

25   **Q.**    How about a pizza restaurant in that same shopping center?

**WHITAKER - CROSS / SAHELIAN**

1    **A.**   What was the name of it?

2    **Q.**   I don't have it at my fingertips right now.

3    **A.**   Sir, I can't.

4    **Q.**   Okay.  It would be at 1590 Rosecrans, the pizza

5    restaurant.

6    **A.**   That doesn't help me, sir.

7    **Q.**   But you did testify at trial that you had sued five

8    businesses in that same shopping center, did you not?

9    **A.**   I'm relying on what you're saying.

10      **MR. SAHELIAN:**  Okay.  It's on page 107 of the trial

11   transcript, Your Honor.

12      **MR. PRICE:**  Will this transcript be put on the screen so

13   Mr. Whitaker can see it?

14      **THE COURT:**  Why don't you just read it.

15      I mean, the reason they were provided in advance was so

16   that you could have it and give it to your client.

17   **BY MR. SAHELIAN:**

18   **Q.**   So I asked you, Mr. Whitaker -- on page 107, I asked you

19   if you'd sued five businesses in that same shopping center.

20      You said you believed so.

21      And I asked you if you sued a pizza shop, and you said,

22   "Yes, sir."

23      I asked you if you sued a hummus shop, and you said, "Yes,

24   sir."

25      And I asked you if you had sued a sandwich shop, a Subway,

1   and you said, "Yes, sir."

2        And then I asked you if you'd sued a massage place, and

3   you said, "Yes, sir."

4        How do you explain the fact that in early December, you

5   seemed to have no difficulty remembering my questions and yet,

6   today, you seem to have difficulty?

7        **MR. PRICE:**  I'm going to object again.

8        **THE COURT:**  Yeah.  Sustained.  Sustained.

9        You didn't note --

10       **MR. PRICE:**  I want to register --

11       **THE COURT:**  Yeah, go ahead.

12       **MR. PRICE:**  I want to register a separate objection.

13       I think this procedure is discriminatory.  Mr. Whitaker

14  has very limited dexterity, and use of Zoom typically requires

15  exhibits to be produced on screen.  There's no expectation that

16  a multi-hundred-page document should be received by the

17  plaintiff, and I think the requirement that Mr. Whitaker have

18  it or be denied access to it is discriminatory.

19       **THE COURT:**  Well, these are exhibits that have been

20  offered into evidence, and there was no objection.  There was a

21  deadline for objections, and no objections were raised to the

22  exhibits.

23       So the exhibits are coming into evidence, and the

24  testimony is coming in because it is non-hearsay -- right? --

25  testimony of a party opponent.

1       So you have no objection to it being admitted into

2  evidence; just him --

3       **MR. PRICE:**  I don't.

4       **THE COURT:**  -- being questioned about it?  Okay.

5       **MR. PRICE:**  I have an objection to it being produ- -- him

6  being questioned about it without his opportunity to review it

7  via the video that we're all participating in.

8       **THE COURT:**  All right.  Well, I was just going to sustain

9  the objection because I just think that line of questions is

10  not relevant, and I don't know how he'd remember a pizza place.

11       And I also wish, Mr. Sahelian, you could start focusing on

12  the restaurant at issue in this case.

13       **MR. SAHELIAN:**  Well --

14       **THE COURT:**  The testimony is in.  It's admitted.  And you

15  can argue whatever you want to argue.  His testimony is there.

16       **MR. SAHELIAN:**  Your Honor, the whole point that --

17  Mr. Whitaker suggests that, in his opening testimony, that he

18  travels to San Francisco quite often and he has an intent to go

19  back to the businesses that he has sued.  And I've got a litany

20  of cases here that he and I have been on opposing sides on, and

21  he hasn't returned to any of them.  So I think --

22       **THE COURT:**  Yes.  But the testimony's all in evidence now.

23  This is the evidentiary hearing part of the case where we're

24  taking evidence, not the argument part.

25       So I guess what I'm saying is, if the point of your

1   question is merely to argue, there's no jury here; we don't

2   need to do that.  You can argue -- but the exhibits have all

3   been admitted.  There was no objection raised to them by either

4   side.  So all the proposed exhibits have been admitted.

5        The testimony is in, and you can argue from his testimony

6   those facts as stated in the transcripts.

7        **MR. SAHELIAN:**  Thank you, Your Honor.

8   **Q.**  Mr. Whitaker, you also testified -- at least you suggest

9   that proximity to your residence is an important factor for you

10  to revisit a business that you've sued.  Is that not correct?

11       **MR. PRICE:**  Objection; foundation.

12       **THE COURT:**  Sustained.

13       **MR. SAHELIAN:**  Okay.

14       **THE COURT:**  What testimony are you referring to?

15       **MR. SAHELIAN:**  All right.  I'm referring to the -- if

16  you'd bear with me just a moment, Your Honor.

17                    (Pause in proceedings.)

18       **MR. SAHELIAN:**  So page 28 of the deposition testimony.

19       **MR. PRICE:**  I'm sorry.  Was that 28?

20       **MR. SAHELIAN:**  Page 28 through page 37.

21       **MR. PRICE:**  Thank you, Your Honor.

22       **THE COURT:**  You're welcome.

23       So is there a line that you're referring to?

24       **MR. SAHELIAN:**  Well, it's a line of questions, Your Honor.

25  **Q.**  And, Mr. Whitaker, if you recall, I asked you -- we were

1   discussing Jersey Mike's in Roseville.  And you volunteered the

2   fact that you had sued a Jersey Mike's around the corner from

3   your apartment downtown.  Do you recall that?

4   **A.**   Yes, sir.

5   **Q.**   Okay.  And I asked you if you had been back to eat at that

6   Jersey Mike's.  Do you recall that question?

7   **A.**   Yes, I do.

8   **Q.**   And your answer was?

9   **A.**   I don't recall what my answer was.

10  **Q.**   Okay.  You said "no."

11        And --

12        **THE COURT:**  What line and page are you referring to?

13        **MR. SAHELIAN:**  I'm referring to page 37, line 21,

14  Your Honor.

15  **Q.**   Now, you also testified in that same deposition,

16  Mr. Whitaker, that you had visited the area, after moving to

17  West Los Angeles, at least a half-a-dozen times with your

18  girlfriend to take her shopping.  Correct?

19  **A.**   I don't know if I said just to take her shopping, but,

20  yes, I've been back in the area several times, yes.

21  **Q.**   Okay.  But you had not stopped by to eat at the restaurant

22  after suing it; correct?

23  **A.**   Correct.

24        **MR. SAHELIAN:**  All right.  So, Your Honor, I could go on

25  with several other cases.  I do have a long history of cases

1    with Mr. Whitaker.  But it's all in the -- it's all in the

2    transcript.

3         **THE COURT:**  Okay.  You'll be able to argue from the

4    transcript.  The transcripts have been admitted into evidence.

5         **MR. SAHELIAN:**  Thank you, Your Honor.

6    **Q.**   So I want to -- I want to wrap up with this, Mr. Whitaker,

7    because it's something that I find troubling.

8         **THE COURT:**  Counsel, now you're testifying; right?

9         **MR. SAHELIAN:**  All right.

10        **THE COURT:**  What you find troubling is totally irrelevant

11   and it's not appropriate.  And if we were in a jury trial,

12   you'd really get -- we are in a bench trial, but I'd ask you

13   please not to testify and just ask questions.

14        **MR. SAHELIAN:**  Thank you, Your Honor.  You are correct.

15   Absolutely.

16   **Q.**   So, Mr. Whitaker, you've now sued about 2,000 businesses.

17   And I -- in going over some of the complaints that I was

18   reading in preparation for this -- you remember we touched upon

19   that pizza shop downtown, close to your apartment, that you had

20   sued?

21        You mentioned in that -- it was a verified complaint in

22   limited jurisdiction -- that you had, in the span of 12 months

23   preceding that lawsuit, filed 656 cases.  Do you have any

24   reason to believe that was a mistake?

25   **A.**   No, sir.

1  Q.   That's 656 cases in the span of 12 months.

2       Now, you've now filed approximately 2,000 cases.  And my

3  question to you is:  Mr. Whitaker, exactly how many of those

4  2,000 cases that you filed, how many of those have you actually

5  taken the time to go back and patronize the businesses you

6  claimed you could not?

7  A.   I couldn't give you an exact number, but hundreds.  And

8  we've broached this particular issue, you and I; and I told

9  you, the last time we spoke about it, is that I'm actively

10 getting a list comprised so that I can revisit every last one

11 of the businesses that I visited.

12      I also told you that it's hard to distinctify [sic] the

13 corporation names from the actual businesses, which has

14 prevented me from visiting a lot of these places that we've

15 settled with.  So I'm actively having a list comprised of all

16 the places that I've sued so that -- because it's very

17 important to me to revisit every last one of those places and

18 make sure that they're -- that they've been remediated, if you

19 recall that, sir.

20 Q.   That's not what you said, Mr. Whitaker.  And I'm trying to

21 find exactly where you told me you didn't even recall whether

22 you sued -- whether you returned to even a hundred.  So --

23 A.   Didn't we have that conversation?

24 Q.   Mr. Whitaker, can you -- strike that.

25      Do you have any evidence, any documentary evidence, in the

1    form of receipts or photographs, of businesses that you have

2    actually returned to?

3    **A.**   No, sir.

4    **Q.**   None?

5    **A.**   I probably have some, I mean, but I don't have somewhere

6    where I've stored them or -- or, you know, have a log of things

7    like that.

8         But like I said, I'm actively comprising a list, getting a

9    list together of all the places that I've settled with so that

10   I can revisit every last business that I've been to.

11   **Q.**   Okay.  So if you've got 2,000 businesses that you have to

12   revisit, based on your commitment you made in the complaints,

13   what is your plan for revisiting these businesses, if you have

14   one?

15   **A.**   One business at a time.

16   **Q.**   Okay.  How long do you think that will take you,

17   currently, based on -- based on your abilities as someone in a

18   wheelchair?

19        **MR. PRICE:**  Objection; relevance, argumentative,

20   speculation.

21        **THE COURT:**  Overruled.

22        **THE WITNESS:**  I don't know how long it'd take me.

23   BY MR. SAHELIAN:

24   **Q.**   Would it be a year, two years, five years, or ten years?

25   Which one's the closest?

1    **A.**   I don't know, sir.  I have to get the list together first.

2    **Q.**   So you don't have a list of businesses that you've sued

3    with you.  And the reason was because?

4    **A.**   The reason is because -- could you clarify?  The reason

5    why?  The reason --

6        **THE COURT:**  Yeah.  Can you reask that question?  I didn't

7    understand.

8        **MR. SAHELIAN:**  Sure.

9    **Q.**   You said -- you said you didn't have a plan in mind

10   because you didn't have a list of businesses that you had sued.

11   Am I correctly stating your testimony, sir?

12   **A.**   I just said my plan was one business at a time, when you

13   asked me what was the plan.

14       **MR. SAHELIAN:**  All right.  I don't think we're getting an

15   answer here, Your Honor.

16   **Q.**   So on page 49 of the deposition transcript, I asked you if

17   the number of businesses, on page -- on page 49, line 7 --

18       **THE COURT:**  Wait.  Let me get it up.

19       **MR. SAHELIAN:**  Sure.

20       **THE COURT:**  Well, you can ask, and then I'll show him.  Go

21   ahead.

22       **MR. SAHELIAN:**  Sure.  Thank you, Your Honor.

23   **Q.**   On page 49, line 7, I asked you if you had a number of

24   mind -- in mind as to the number of businesses that you've

25   returned to after suing, and you said "no" on line 10.

1      And then I asked you, "Would it be a number that exceeds

2  100?"

3      And you said, "I wouldn't know.  I couldn't give you a

4  number."

5      Do you have any reason to change that testimony today?

6  **A.**   Yes, sir.  Today I said hundreds.

7  **Q.**   Okay.  So what changed between the time I took that

8  deposition and today?

9  **A.**   What changed is I've had more time to give it more

10  thought.  I mean, it's just, if I've sued 2,000 places,

11  according to you, I mean, I revisit places all the time.  I

12  mean, different malls -- different malls that I've had places

13  that I sued, I go back to malls all the time.

14                    (Telephone interruption.)

15      **THE WITNESS:**  Sorry, Your Honor.

16      **THE COURT:**  That's okay.

17      **THE WITNESS:**  Trying to get back to you guys.  I'm on my

18  computer, but my phone is connected to my computer.

19      **THE COURT:**  We can hear you.

20      **THE WITNESS:**  Can you guys still see me?

21      **THE COURT:**  We can see you.  You can't see us?

22      **THE WITNESS:**  I can't see you guys now.

23      Well, it's okay.  I'm ready.

24      **THE COURT:**  Thank you.

25      **THE WITNESS:**  I can't see you guys, though, but go ahead.

1    THE COURT:  Well, let's hold on.

2        Go ahead.  You can take a moment, Mr. Whitaker, and try to

3    fix that.

4        THE WITNESS:  Okay.

5                    (Pause in proceedings.)

6        THE COURT:  How much longer do you have, Mr. Sahelian?

7        MR. SAHELIAN:  Not much longer, Your Honor.

8        THE COURT:  Why don't we do this.  Why don't we take a

9    five-minute break so Mr. Whitaker can get his computer working

10   and give the court reporter a break.  All right?  We'll return

11   at 10:56.

12                (Recess taken at 10:51 a.m.)

13                (Proceedings resumed at 10:58 a.m.)

14       THE COURT:  All right, Mr. Sahelian.  Go ahead.

15       MR. SAHELIAN:  I just have just a little bit more,

16   Your Honor, and we should be done.

17   Q.   So at the trial, Mr. Whitaker -- and I'm referring to your

18   testimony on page 166 -- I asked you if you had a plan to

19   revisit all the businesses that you had sued.

20       And if you recall, you said that you'd reached out to the

21   Potter Handy firm.  You could get the actual addresses and

22   names of the businesses that you had sued.

23       Do you recall that?

24   A.   Yes, sir.

25   Q.   All right.

**WHITAKER - CROSS / SAHELIAN**

1      **MR. PRICE:**  I'm going to object to this line of testimony.

2    It's clearly implicating the attorney-client privilege.

3       **THE COURT:**  Not if he's asking what was in the trial

4    transcript.  If it goes beyond that.  But if it's in the trial

5    transcript, it's public.

6       All right.  Go ahead.

7    **BY MR. SAHELIAN:**

8    **Q.**   I asked you, then, how long it would take you -- on

9    page 167 -- how long it would take you to go back and revisit

10   each of the businesses as part of your advocacy.  Do you recall

11   what your answer was?

12   **A.**   No, sir.

13   **Q.**   You said (as read):

14         "That, I cannot tell you, sir."

15      And then a few paragraphs further down, you said you were

16   pretty sure that you could revisit all the places within

17   two years.

18      And then I asked you -- I did a little bit of math there,

19   and I asked you if you could do -- revisit four businesses

20   a day, because that's what it would entail if you needed to get

21   it done in two years.  Do you recall what your answer was with

22   respect to visiting four businesses a day?

23   **A.**   No.

24   **Q.**   You said you don't know.  You didn't know.  Okay?

25      **THE COURT:**  What line is that?

```
 1          MR. SAHELIAN:  Page 167, line...

 2                        (Pause in proceedings.)

 3          MR. SAHELIAN:  One moment, Your Honor.

 4          That would be line 15, Your Honor.

 5          THE COURT:  Okay.

 6     BY MR. SAHELIAN:

 7     Q.   And then I asked you to walk us through and tell us how

 8     you were going to be able to revisit 1,500 businesses in

 9     two years, to explain your plan.  Do you recall what your

10     answer was, Mr. Whitaker?

11     A.   No, sir.

12     Q.   So what is your plan for revisiting 1,500 businesses in

13     two years?

14     A.   One business at a time, sir.

15     Q.   Okay.  Understood.  But how long do you think it'll take

16     you, or how many businesses do you think you would have to

17     revisit in order to make --

18          MR. PRICE:  Objection; relevance and asked and answered.

19          THE COURT:  Asked and answered.  Sustained.

20          MR. SAHELIAN:  Thank you, Your Honor.

21     Q.   I then asked you on page 168, on line 10, whether you

22     could -- given your disability, you could maintain a rigorous

23     schedule of four visits per day.  Do you recall what your

24     answer was?

25     A.   I'm not sure what my answer was.  But what I would like to
```

**WHITAKER - CROSS / SAHELIAN**

1  say is, that I wouldn't want to put myself under the confines

2  of saying four a day for a year or two years.  What I can say

3  with certainty is that we are actively comprising a list of

4  every single case that I've settled with, and I'm going to

5  revisit every single one, no matter how long that takes,

6  because remediation is very important to me.

7  **Q.**  Would you be -- well, let me ask you this, Mr. Whitaker.

8  You are currently filing 30 or 60 lawsuits a month in the

9  Northern District.

10     **MR. PRICE:**  Objection.  It's not a question.

11 **BY MR. SAHELIAN:**

12 **Q.**  How many questions -- strike that.

13     How many -- how many lawsuits are you filing every month

14 in the Northern District currently?

15 **A.**  I don't know, sir.

16 **Q.**  Okay.  Would it be fair to say it's -- the number is

17 somewhere between 30 and 60 a month?

18 **A.**  I would say it's fair.

19 **Q.**  Do you read the complaints that are filed?

20 **A.**  Yes, sir.

21 **Q.**  Do you read every paragraph?

22     **MR. PRICE:**  Objection; relevance.

23     **THE COURT:**  Is there a particular paragraph that you want

24 to ask about?

25     **MR. SAHELIAN:**  Thank you, Your Honor.

**WHITAKER - CROSS / SAHELIAN**

1    **Q.**   Do you read the paragraph where it says you intend to

2    return to patronize the business?

3    **A.**   Yes, sir.

4    **Q.**   Okay.  And that's the same language that you used three,

5    four years ago in the complaints that you filed back then;

6    correct?

7    **A.**   Yes, sir.

8    **Q.**   Okay.  One last question, Mr. Whitaker.  Is time a

9    constraint in terms of how quickly you can revisit these

10   businesses, now that you seem to want to do it?

11   **A.**   When you say --

12       **MR. PRICE:**  Objection; relevance.

13       **THE COURT:**  Overruled.

14       **THE WITNESS:**  When you say "time" -- "is time a

15   constraint," what do you mean by that?

16   **BY MR. SAHELIAN:**

17   **Q.**   In other words, the speed at which you could revisit each

18   of these businesses is a function of the amount of time that

19   you can dedicate to it.

20       **MR. PRICE:**  Objection; calls for speculation.

21       **THE COURT:**  If you understand the question, you can answer

22   it.

23       **THE WITNESS:**  I really don't understand it, to be honest,

24   Your Honor.

25       **THE COURT:**  Okay.

1  BY MR. SAHELIAN:

2  Q.   All right.  Well, let me rephrase it again.

3       How many businesses do you think you can revisit

4  every week?

5       **MR. PRICE:**  Objection; calls for speculation.

6       **THE COURT:**  Overruled.

7       **THE WITNESS:**  I don't know how to answer that question.  I

8  don't know.

9  BY MR. SAHELIAN:

10  Q.   Can you give me a ballpark number?

11  A.   Every week?

12  Q.   Correct.

13  A.   I would say anywhere from one to a hundred in a week.

14  Q.   Okay.  So what other things keep you busy during the week,

15  Mr. Whitaker?  For instance, do you have a job?

16  A.   I'm an audio engineer, a songwriter.

17  Q.   Okay.  How many hours a week do you dedicate towards that?

18  A.   I'm always -- I mean, I'm always working on my craft.

19  Q.   Understood.  But how many hours a week do you -- can you

20  work as an audio engineer --

21  A.   Oh, that's --

22  Q.   -- songwriter?

23  A.   That's freelance.  So just a few hours; couple of hours.

24  Q.   What's "couple of hours"?  Two to four hours a week?

25  A.   Yeah.  It could be -- it could be one to four hours maybe.

**WHITAKER - CROSS / SAHELIAN**

1    Q.    Okay.  What else keeps you busy during the week,

2    Mr. Whitaker?

3    A.    I like to work on a lot of personal development, reading.

4    I like watching YouTube documentaries.  But a lot of personal

5    development.  I'm really into that.

6    Q.    And you like traveling; correct?

7    A.    Correct.

8    Q.    And you travel two to three times a month to the

9    San Francisco area; correct?

10   A.    Correct.

11   Q.    Okay.  And I'm sure by now you've seen all the touristic

12   spots several times over.  Correct?

13   A.    No.  I'm sure I haven't seen them all yet.  No, I wouldn't

14   agree with that.

15   Q.    That's part of your plan, is to -- is to explore every

16   corner of the San Francisco area; correct?

17   A.    That's not part of my plan, no.  I never said that.

18   Q.    Okay.  But you do make it up to the San Francisco area

19   two, three times a week -- a month -- excuse me -- correct?

20   A.    Yes, sir.

21   Q.    So if it's not for tourism, what is the purpose?

22   A.    Well, if you -- if you listened earlier, I relayed to you

23   that I've been actively looking for a place to live in the

24   Bay Area.

25   Q.    Okay.  But you also mentioned that you hadn't seen a

**WHITAKER - CROSS / SAHELIAN**

1  real estate agent, a rental agent.  You hadn't investigated --

2  you had not investigated properties online.  Correct?

3  **A.**   Well, you have to understand, my lease is not up until

4  October, sir.  So that would be putting the cart before the

5  horse.  Once it gets closer to the time for me to move, then I

6  will be meeting with rental agents and leasing agents and

7  things of that nature.  I don't want to --

8  **Q.**   And you have --

9  **A.**   -- waste --

10  **Q.**   I'm sorry.  I cut you off.

11  **A.**   I said, I don't want to waste anyone's time at this point.

12  **Q.**   Okay.  And you have been busy filing 30 to 60 lawsuits

13  a month; correct?

14  **A.**   Yes, sir.

15  **Q.**   Okay.  Would it be fair, Mr. Whitaker, if time is a

16  constraint in terms of revisiting -- strike that.  Let me go

17  back to another question.

18      How much of your time does locating and suing 30 to 60

19  businesses a month -- how much of your time does that take?

20  **A.**   I don't understand the question.

21  **Q.**   In other words, you have, as you mentioned, your advocacy

22  program, where you travel up to the Bay Area and you sue 30 to

23  60 businesses a month.  How much of your time does that

24  endeavor take?

25  **A.**   I've never said I have an advocacy program, and I never

1    said that I travel up to the Bay to sue businesses.  I've never

2    relayed that to you, sir.

3    **Q.**   Okay.  Does that take any of your time at all, finding and

4    suing businesses, new businesses?

5    **A.**   That's not my motivation.  If you want to -- if you want

6    to know how much time it takes for me to canvass an area to see

7    if I want to live there, then that would be a fair question.

8    But I don't go to these places to look for places to sue.

9    That's not my motivation.

10   **Q.**   I see.  So, essentially, what you're -- what you're

11   testifying to is that finding and suing 30, 60 businesses

12   a month does not take any of your time.  Is that correct?

13        **MR. PRICE:**  Objection; misstates testimony.

14        **THE COURT:**  Overruled.

15        **THE WITNESS:**  I don't understand the question.

16        **MR. SAHELIAN:**  Well, we'll just move on.

17   **Q.**   So what would it take, Mr. Whitaker, to get you to

18   accelerate your plan to revisit these 2,000 businesses that

19   you've sued?

20   **A.**   There's no need to accelerate the plan because it's

21   something that I'm actively pursuing.  I don't need a

22   jump-start to do it.  It's something that's very important to

23   me, which I've told you, which I've relayed to you but you

24   apparently act like we've never had the discussion.

25   **Q.**   But as we sit here today, you have no evidence of any

WHITAKER - CROSS / SAHELIAN

1  photographs that you've taken of a property that you've

2  revisited; correct?

3  **A.**   I can't say that.  I mean, I may have some photos,

4  photographs, of some places that I revisited.  I would have to

5  check.

6  **Q.**   And as we sit here today, do you have any receipts of

7  businesses that you've gone back to and patronized; any

8  receipts in terms of evidence?

9  **A.**   None that I can attest to, but I may.  I mean, I have a

10  lot of receipts.  So I don't know.

11     **MR. SAHELIAN:**  Okay.  No further questions, Your Honor.

12     **THE COURT:**  Okay.  Before, Mr. Price, I let you requestion

13  Mr. Whitaker, I have a few questions.

14     Mr. Whitaker, of the hundreds of cases you filed in the

15  Northern District in 2021, do you know approximately how many

16  have resolved, have settled?

17     **THE WITNESS:**  No, Your Honor.  I don't have a --

18     **THE COURT:**  I mean, half of them?

19     **THE WITNESS:**  I would say maybe a third.

20     **THE COURT:**  And have you gone back and visited any of

21  those --

22     **THE WITNESS:**  No, Your Honor.

23     **THE COURT:**  -- places?

24     **THE WITNESS:**  No, Your Honor.

25     Well, I'm not going to say that.  I have revisited places

1  in the mall that's in Santa Clara.  I can't think of the name

2  of the mall, but I have been back to that mall several times.

3      **THE COURT:**  Okay.  All right.  And since you filed this

4  lawsuit, have you been back to Redwood City?

5      **THE WITNESS:**  I have been back to Redwood City, yes,

6  Your Honor.

7      **THE COURT:**  Okay.  But you haven't visited this

8  restaurant?

9      **THE WITNESS:**  No, Your Honor.  For one, I'm deterred in

10  revisiting any businesses that there's still active litigation,

11  to be honest, because I've been approached by owners before,

12  threatened.

13      **THE COURT:**  No, no, no.  I understand.  I understand.

14  This one hasn't resolved.

15      **THE WITNESS:**  Oh, yeah.

16      **THE COURT:**  So there isn't any evidence in front of me

17  that the --

18      **THE WITNESS:**  Yes, Your Honor.

19      **THE COURT:**  -- that the barrier has been removed.

20  I'm just --

21      **THE WITNESS:**  Yes, Your Honor.  I haven't been back.

22      **THE COURT:**  -- trying to ask questions about this lawsuit.

23  When was the last joint site inspection in the Northern

24  District of California that you attended in person?

25      **THE WITNESS:**  Wow.  That was -- that was early in the

**PROCEEDINGS**

1   pandemic.

2       **THE COURT:**  Okay.  And do you remember what business that

3   was for?

4       **THE WITNESS:**  I don't.

5       **THE COURT:**  You testified that you've asked to try to

6   develop a list of businesses that you've sued so that you could

7   go back now and visit them.

8       **THE WITNESS:**  Yes, Your Honor.

9       **THE COURT:**  When did you start -- when did you ask to have

10  that list developed?

11      **THE WITNESS:**  Whenever that -- whenever the -- let me see.

12  Me and Mr. Sahelian had a case against California Pizza

13  Kitchen.  We had a trial.  It was around that time.

14      **THE COURT:**  Okay.  Whenever that trial was.  Do you

15  remember when the trial was?

16      **THE WITNESS:**  Mr. Sahelian, do you remember when that

17  trial was?

18      **MR. SAHELIAN:**  I'm afraid you have me confused with

19  Mr. James Link.

20      **THE WITNESS:**  Oh, Mr. James Link, yeah.  Around that time.

21      **THE COURT:**  Okay.  You don't remember when that was?

22      **THE WITNESS:**  I'm sorry, Your Honor, but it was

23  approximately maybe -- maybe three months ago.

24      **THE COURT:**  Three months.  Okay.  Great.  Okay.  Thank

25  you.

1     Mr. Price, go ahead.

2                    **REDIRECT EXAMINATION**

3   **BY MR. PRICE:**

4   **Q.**   All right, Mr. Whitaker.  I have just a few more questions

5   for you.

6        In your conversation with Mr. Sahelian, you mentioned that

7   your advocacy is not your primary reason for doing things?

8        Is there any point when you are out in -- out in the

9   world, when you're visiting businesses, that you are not using

10  your wheelchair?

11  **A.**   No, sir.

12  **Q.**   Is there any point when you're out in the world that you

13  are not aware that you're using a wheelchair?

14  **A.**   No.

15  **Q.**   Is there any point that you stop looking for

16  accessibility?

17  **A.**   Never.  It's -- it's almost like it's an involuntary

18  action.  Like, immediately, I'm -- no matter where I go, what

19  I'm doing, I'm immediately making sure that the place, wherever

20  I'm at, is accessible.

21  **Q.**   So would you say there's ever a time that you can turn

22  that off?

23  **A.**   No.  No, sir.

24  **Q.**   Are you an attorney?

25  **A.**   No.

WHITAKER - REDIRECT / PRICE

1    Q.   Do you write any of the complaints that are filed in your

2    cases?

3    A.   I don't.

4    Q.   So when you go to a business and you're obviously using

5    your wheelchair to get there, is there any time you go to a

6    business and you're not thinking about the accessibility of

7    that business before you patronize it?

8    A.   No, sir.

9    Q.   So would you say that advocacy is always on your mind when

10   you're patronizing businesses?

11        **MR. SAHELIAN:**  Leading, Your Honor.

12        **THE COURT:**  Sustained.

13   BY MR. PRICE:

14   Q.   Mr. Whitaker, when would you say advocacy enters your mind

15   at a business?

16   A.   As soon as I get there.

17   Q.   So you have a flight, I think you said, booked for

18   Wednesday.

19   A.   Yes, sir.

20   Q.   Do you think you're going to have to think of advocacy

21   when you're in the Bay Area then?

22   A.   Of course.  Yes, sir.

23   Q.   Now, when the judge was speaking to you, you mentioned

24   something about not returning during litigation and that you've

25   been threatened.  Can you describe that a little bit?  Maybe a

1  time that you remember that kind of event.

2  **A.**   One time that -- that sticks out in my mind immediately is

3  an incident that I had in Beverly Hills.  I was actually taking

4  a photo of some tables that were inaccessible.  And after I

5  took the photos, there was a gentleman right by the restaurant,

6  and he confronted me.  He said -- he actually yelled out my

7  name.

8       And when he said my name, I said, "Yes, that's me."

9       And he said -- he said, "Oh, so you're" --

10      **MR. SAHELIAN:**  Hearsay, Your Honor.  Objection.

11      **THE WITNESS:**  Oh.

12      **THE COURT:**  Well, he's offering it not for the truth of

13 the matter, but for how it makes him feel.

14      Go ahead, Mr. Whitaker.

15      **THE WITNESS:**  Okay.  I'll just sum it up.  But basically,

16 it was a -- it was a person that I had sued his business and we

17 were in active litigation.  And he said, to the owner of the --

18 of the business that I had just took the photos of, that "This

19 guy is suing me, and I wouldn't let him eat at your

20 restaurant," and basically, you know, I better watch my back

21 because he's going to take me down.

22 **BY MR. PRICE:**

23 **Q.**   Did that scare you at all?

24 **A.**   Absolutely.  You know, I was glad that I had a friend with

25 me, or the situation, you know, could have ended bad for me.

1      **MR. SAHELIAN:**  Relevance, Your Honor.

2      **THE COURT:**  All right.  Well, I think it's okay to allow

3  Mr. Whitaker to explain that.

4      Go on.  Next question.

5      **MR. PRICE:**  I do want to go deeper into this, as whether

6  or not he's gone back during litigation has been --

7      **THE COURT:**  Well, he doesn't need to go back.  I think

8  that's clear.  Because unless a barrier has been removed, under

9  the law, he's deterred from going back.  So I don't think he

10  has to explain and will not be faulted for not going back while

11  in active litigation, in addition to the other reason.  But

12  under the law, he doesn't have to.

13      **MR. PRICE:**  Thank you, Your Honor.

14  **Q.**  So you mentioned that you're looking to relocate to a new

15  area.  What does that entail for you?

16      Let me be a little more specific.  When you're in a city

17  that maybe you haven't been to before, what kind of things are

18  you looking for when you say you're looking at that area to

19  potentially live there?

20  **A.**  I'm looking for, you know, good neighborhoods, safety,

21  amenities as far as things that you're accessible to:

22  restaurants, grocery stores, convenience stores, things of

23  that nature.  So, you know, it requires me -- for someone

24  that's not familiar with that area, it requires me, you know,

25  to travel around and see and get a feel for the areas.

**WHITAKER - REDIRECT / PRICE**

1   Q.   Okay.  So you're not just looking at the prices of houses

2   or specific houses?

3   A.   No.  No, sir.

4   Q.   When you're looking at new areas to live, are you looking

5   at the accessibility of the area as a city?

6        **MR. SAHELIAN:**  Leading, Your Honor.

7        **THE COURT:**  Overruled.

8        **THE WITNESS:**  Could you repeat the question?

9   BY MR. PRICE:

10  Q.   When you're looking at a new city to look in -- to move

11  to, are you looking at the accessibility of the city at all?

12  A.   I am.  But unfortunately, pretty much every city is just

13  not accessible.  I mean, I find the same problems everywhere.

14  But, yes, it's very important to me.

15  Q.   When was the last time you ate at a Jersey Mike's?  Not a

16  specific one, but any Jersey Mike's.

17       **MR. SAHELIAN:**  Relevance, Your Honor.

18       **THE COURT:**  Overruled.

19       **THE WITNESS:**  It had to be a couple of months ago.

20  BY MR. PRICE:

21  Q.   Do you have a -- withdraw.

22       Do you find that different Jersey Mike's locations taste

23  different from each other?

24  A.   No, sir.

25  Q.   So do you remember the Jersey Mike's that Mr. Sahelian was

1   asking you about before?

2   **A.**   I do.

3   **Q.**   When you filed that lawsuit, did you intend to go back to

4   Jersey Mike's?

5   **A.**   Yes.

6   **Q.**   And when you said you intended to go back to

7   Jersey Mike's, did you have a particular interest in that

8   Jersey Mike's versus any other Jersey Mike's in the area?

9   **A.**   No, sir.

10  **Q.**   Do you still like Jersey Mike's?

11  **A.**   I love Jersey Mike's.

12  **Q.**   And you consider yourself a Jersey Mike's customer?

13  **A.**   Absolutely.

14  **Q.**   You've filed a lot of cases.  You've settled a lot of

15  cases, you mentioned.

16      Have you ever won any?

17  **A.**   Yes, sir.

18  **Q.**   And have you ever lost any?

19  **A.**   Yes, sir.

20  **Q.**   You said you were -- you were in college as an athlete;

21  right?

22  **A.**   Correct.

23  **Q.**   Did you ever fail anything as an athlete, take a shot and

24  miss?

25  **A.**   Definitely.

**WHITAKER - REDIRECT / PRICE**

1  **Q.**   Did you ever make adjustments to your shot afterward?

2  **A.**   Yes.

3  **Q.**   As an advocate, when you lose, do you feel like you should

4  make some adjustments?

5  **A.**   Could you elaborate?

6  **Q.**   I'm not sure the judge will let me.

7      **THE COURT:**  Well, I'm not quite sure where this is going.

8      **MR. PRICE:**  I do have a point here.

9      **THE COURT:**  Is it an argument that you can make as opposed

10 to an evidentiary record?  Because we're going to have plenty

11 of time for argument.

12     **MR. PRICE:**  I do think there's one point I need to make

13 here.

14 **Q.**   So during your deposition with Mr. Sahelian, he asked you

15 a lot of questions about your plans to go back to businesses,

16 and you mentioned that you didn't have any concrete plans.

17 Does that state your testimony correctly?

18 **A.**   Yes, sir.

19 **Q.**   Okay.  What made you want to change your procedures after

20 that?  You testified --

21     **MR. SAHELIAN:**  Leading, Your Honor.

22     **MR. PRICE:**  He testified --

23     **THE COURT:**  Overruled.  Overruled.  Go ahead.

24     **THE WITNESS:**  Could you ask that again, sir?

25 \\\

WHITAKER - REDIRECT / PRICE

1    BY MR. PRICE:

2    Q.   Did that deposition influence you in any way?

3    A.   As far as?

4    Q.   As far as making changes to the way that you view your

5    advocacy.

6    A.   I got lost with the question.

7    Q.   Let me rephrase it.  You mentioned that you have changed

8    the way that you view going back to businesses.  Before, you

9    just kept it up in your head, and now you're trying to create

10   something more concrete.

11   A.   Yes, sir.

12   Q.   What has motivated that change in your habit?

13   A.   I understand now.  Yes, sir.  Yes, it did.

14   Q.   Okay.  And are there other things that have motivated

15   those changes?

16   A.   Yes.

17   Q.   What sort of things?

18   A.   So one thing in particular would be, you know, I want to

19   hold these businesses accountable.  So if I have no record of

20   the places that I've been back to, then I'm not really applying

21   the change or making the change effective as I really want it

22   to be, because a lot of these -- a lot of businesses don't make

23   the changes.  Like, I'm seeing a lot of places in Los Angeles

24   that I've been to that I've brought litigation against and

25   there's still no accessibility.  So I want to hold these

WHITAKER - REDIRECT / PRICE

1  businesses more accountable for what they say they're going to

2  do.

3  **Q.**   So do you think that's going to make you a more effective

4  advocate?

5  **A.**   Absolutely.

6  **Q.**   In your life, do you ever -- you know, you -- sorry.  Do

7  you have a girlfriend?

8  **A.**   Yes, I do.

9  **Q.**   All right.  Do you ever tell your girlfriend you're going

10  to do something, you intend to do it, and then you forget or

11  just fail to do it for some reason?

12  **A.**   Yes.

13       **MR. SAHELIAN:**  Relevance, Your Honor.

14       **THE COURT:**  It's thin, but go ahead, Mr. Price.

15       **THE WITNESS:**  Yes, sir.

16  **BY MR. PRICE:**

17  **Q.**   Yes, you do?  You're not intending -- you're not lying to

18  her when you say you're going to do it and then don't; right?

19       **MR. SAHELIAN:**  Leading, Your Honor.

20       **THE COURT:**  Sustained.

21       **MR. SAHELIAN:**  Argumentative.

22  **BY MR. PRICE:**

23  **Q.**   When you say you're going to do something and then you

24  forget to do it, are you lying?

25  **A.**   No, sir.

1   **Q.**   Is there anything that happens in your cases, you know,

2   you say you're going to intend to go back to something and then

3   circumstances change after filing the litigation?

4          **MR. SAHELIAN:**  Leading, Your Honor.

5          **THE COURT:**  Overruled.

6          **THE WITNESS:**  Can you ask it again, sir?

7   **BY MR. PRICE:**

8   **Q.**   When you file your lawsuits, most of your lawsuits say you

9   intend to return to the place that you had sued.

10  **A.**   Mm-hmm.

11  **Q.**   Are there any circumstances that change after filing the

12  lawsuit that would make you not return?

13  **A.**   Yes, sir.

14  **Q.**   What are among -- what sort of things might happen that

15  would change that?

16  **A.**   Well, for one, you know, if I move from the area, the

17  proximity that I am to the area, which still doesn't take away

18  from my intent to return.  Like I said, once I get this list

19  comprised, I plan on going to every single place.  I don't care

20  if it's across the state or across the street.  You know what I

21  mean?  So my intent to return has never wavered.

22  **Q.**   Okay.  So would it be fair to say that when you moved

23  further from a place, incidentally going back became less

24  common?

25         **MR. SAHELIAN:**  Leading, Your Honor.

1      **THE COURT:**  Sustained.

2   **BY MR. PRICE:**

3   **Q.**   Is there any way that moving away from a business would

4   make it harder for you to return to it?

5   **A.**   Yes, sir.

6   **Q.**   But if you have a list, would that change that

7   circumstance?

8   **A.**   Absolutely.

9   **Q.**   And is that part of why you're making yourself -- why

10  you're having a list made?

11  **A.**   Yes.

12      **MR. SAHELIAN:**  Your Honor, this entire line of questioning

13  was leading.  Mr. Price is --

14      **THE COURT:**  It's all right.  I'm perfectly capable of

15  adjudicating the facts in this case, Mr. Sahelian.

16      **MR. SAHELIAN:**  Thank you, Your Honor.

17      **THE COURT:**  You objected and I ruled.

18      Okay.  Anything further, Mr. Price?

19      **MR. PRICE:**  I'm just double-checking one thing here.

20  **Q.**   You mentioned that you started looking at living in the

21  Sacramento area.  What motivated the change to look in

22  Sacramento versus the Bay Area proper?

23  **A.**   Prices.  That was a main -- that was a main factor, was

24  prices.  The closer you get to San Francisco, it seems that the

25  higher the prices go.  So that was one of the main things, was

1  prices and more bang for your buck.

2  **Q.**   Do you expect that if you end up choosing to live in

3  Sacramento, that that will cause you to go to the Bay Area less

4  than you do right now?

5       **MR. SAHELIAN:**  Leading, Your Honor.

6       **THE COURT:**  Sustained.

7  **BY MR. PRICE:**

8  **Q.**   When you move to -- if you move to the Sacramento area,

9  how often do you intend to return to the Bay Area?

10  **A.**   I could see myself -- I could see myself going up there

11  two to three times a month.

12  **Q.**   So do you see moving closer to -- if you move to the

13  Sacramento area, will you go there less often than you do now?

14  **A.**   No, sir.

15       **MR. PRICE:**  Nothing further, Your Honor.

16       **THE COURT:**  Thank you.

17       Anything further, Mr. Sahelian?

18       **MR. SAHELIAN:**  No.  I'll spare you the pain and

19  aggravation, Your Honor.

20       **THE COURT:**  All right.  Okay.  Well, let's do this.

21       Now we have an evidentiary record, and we'll get a

22  transcript.

23       And so what I think then I want the parties to do is to

24  file a post-hearing brief, then, on whether the plaintiff has

25  met his burden of showing standing for injunctive relief under

1    the ADA.

2        And after I consider those briefs, I may set an oral

3    argument, as well, by video, because it is an important issue,

4    particularly given the number of cases that Mr. Whitaker has

5    here.  So I want to make sure we fully vet it.

6        So, Mr. Price, how much time would you like?  I mean,

7    it'll take a little while to get the transcript.

8        **MR. PRICE:**  Yeah.  So, I mean absolutely no disrespect to

9    the court reporter, but I understand transcripts have started

10   taking longer because more and more hearings are happening in

11   certain ways.

12       I would like to have three weeks after I obtain the

13   transcript.

14       **THE COURT:**  Okay.  I think that's a good way of pushing

15   it, after the trans- -- so three weeks?  Okay.  We can do that.

16       And then, Mr. Sahelian, I think probably you could then

17   file a responsive brief.  How much longer after that would you

18   like?

19       **MR. SAHELIAN:**  Two weeks will be fine, Your Honor.

20       **THE COURT:**  Two weeks.  Okay.

21       **MR. PRICE:**  Respectfully, Your Honor, this is defendant's

22   motion.  It would seem like he would have the initial document

23   and we would be responding to it.

24       **THE COURT:**  Well, if you want to do it that way, that's --

25       **MR. PRICE:**  Or simultaneous briefing, I suppose, would be

**PROCEEDINGS**

1   fine.

2        **THE COURT:**  Yeah, that's fine.  Or simultaneous.

3        **MR. SAHELIAN:**  I'm fine filing the opening brief,

4   Your Honor.

5        **THE COURT:**  Okay.  We'll do it that way.  And then you

6   respond, Mr. Price.

7        The only reason I did it that way is because it's

8   ultimately plaintiff's burden, but you are correct; it was

9   their motion.

10       All right.  So, Mr. Sahelian, you'll file your brief

11   three weeks after the transcript is available.

12       And, Mr. Price, can you respond within two weeks of that?

13       **MR. PRICE:**  Yes.  Or simultaneous briefing.  I'd be happy

14   with either.

15       **THE COURT:**  If you want simultaneous, that you don't see

16   it, that's fine.

17       **MR. PRICE:**  Let's do two weeks after, I suppose.

18       **THE COURT:**  Yeah.

19       **MR. PRICE:**  There's no reason to turn down any advantage.

20       **THE COURT:**  I don't know if it's an advantage.  I think

21   it's more useful for me because, then, actually you're meeting

22   their argument.

23       And at that point, I'll take it under submission, and I'll

24   let the parties know if we're going to schedule oral argument

25   then.

**PROCEEDINGS**

1      **MR. PRICE:**  Thank you, Your Honor.

2      **THE COURT:**  Okay.  And as far as page limit, we'll stick

3  to 25 pages.

4      **MR. PRICE:**  That should be --

5      **THE COURT:**  And then make sure, if you're citing to this

6  transcript or other exhibits which were admitted in the case,

7  you give me precise pincites.

8      All right.  Great.  Thanks, everyone.

9      **MR. SAHELIAN:**  Thank you very much, Your Honor.

10      **THE COURT:**  Mr. Whitaker, are you rooting for the Rams on

11  Sunday?

12      **THE WITNESS:**  You know I am.

13      **MR. PRICE:**  Objection, Your Honor.

14      **THE WITNESS:**  I'm a Cowboys fan, but I'm rooting for the

15  Rams this Sunday.

16      **THE COURT:**  All right.  Thank you.  Bye-bye.

17      **THE WITNESS:**  Thank you.

18           (Proceedings adjourned at 11:34 a.m.)

19                    ---o0o---

20

21

22

23

24

25

1

2                          <u>**CERTIFICATE OF REPORTER**</u>

3          I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5

6    DATE:  Monday, February 21, 2022

7

8

9    _____

10        Ana Dub, CSR No. 7445, RDR, RMR, CRR, CCRR, CRG, CCG
                  Official United States Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25